1  Robert F. McCauley (SBN 162056)
   robert.mccauley@finnegan.com
2  Jeffrey D. Smyth (SBN 280665)
   jeffrey.smyth@finnegan.com
3  Holly Atkinson (SBN 286546)
   holly.atkinson@finnegan.com
4  FINNEGAN, HENDERSON, FARABOW,
     GARRETT & DUNNER, LLP
5  3300 Hillview Avenue
   Palo Alto, California 94304
6  Tel: (650) 849-6600
   Fax: (650) 849-6666
7
   Attorneys for Plaintiffs ASETEK HOLDINGS,
8  INC. and ASETEK A/S

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13  ASETEK HOLDINGS, INC. and ASETEK A/S,        CASE NO.  3:12-CV-04498-EMC

14               Plaintiffs,                     **PLAINTIFFS' RESPONSIVE CLAIM
                                                 CONSTRUCTION BRIEF
15         v.                                    RE: U.S. PATENT NO. 8,382,456**

16  COOLIT SYSTEMS INC.,

17               Defendant.                      **Date:**  November 25-26, 2013
                                                 **Time:** 2:30 p.m.
18                                               **Courtroom:** 5, 17th Floor
                                                 **Judge:** Hon. Edward M. Chen
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ........................................................................1

        A.      Technical Background ........................................................................................1

        B.      The CoolIT Patent and the Nature of the Claimed Invention ...............................1

III.    ARGUMENT ..................................................................................................................2

        A.      Legal Standards ..................................................................................................2

        B.      "Heat Exchanger" ..............................................................................................2

                1.      The intrinsic evidence supports Asetek's proposed construction. ...............2

                2.      CoolIT is attempting to improperly expand the scope of "heat
                        exchanger" based on an unexplained amendment made after this
                        litigation began, and after receiving a Notice of Allowance. .....................7

                3.      CoolIT's proposed "plain and ordinary meaning" construction is
                        inconsistent with the intrinsic evidence. ...................................................10

        C.      "Inlet Through the Housing Opening to the Reservoir" ........................................11

        D.      "Retainer" ...........................................................................................................14

                1.      Claim limitations that are expressed in functional terms without
                        reciting sufficient structure are construed as means-plus-function
                        limitations, even where the word "means" is not used. ...........................15

                2.      "Retainer" should be limited to the ridges disclosed in the '456 patent
                        specification. ...........................................................................................17

        E.      "Flow Path Through the Pump Inlet Into the Reservoir, Past the Resiliently
                Compressible Member and Out the Port into the Impeller Chamber" .................19

        F.      "Reservoir" .........................................................................................................21

        G.      "Loose in the Inner Chamber" ............................................................................23

        H.      "Urge Against"....................................................................................................24

IV.     CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGES**

*Abbott Laboratories v. Dey, L.P.*,
    287 F.3d 1097 (Fed. Cir. 2002)...................................................................21

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003).................................................................15

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*,
    288 Fed. App'x 697 (Fed. Cir. 2008)........................................................15

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)................................................................15

*Desper Products, Inc. v. QSound Labs, Inc.*,
    157 F.3d 1325 (Fed. Cir. 1998)........................................................ passim

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988)..................................................................2

*Genzyme Corp. v. Transkaryotic Therapies, Inc.*,
    346 F.3d 1094 (Fed. Cir. 2003)...............................................................8, 9

*Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000)..................................................................13

*Honeywell International, Inc. v. ITT Industries, Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006)..................................................................4

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013)..................................................................8

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004)................................................................16

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)...........................................................15, 16

*Massachusetts Institute of Technology and Electronics For Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006)................................................................16

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)..................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................2

*Research Corporation Technologies, Inc. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010)....................................................................4

*Southwall Technologies, Inc. v. Cardinal IG, Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)....................................................................................3

*Springs Window Fashions LP v. Novo Industries, L.P.*,
  323 F.3d 989 (Fed. Cir. 2003).............................................................................. passim

*Toshiba Corp. v. Lexar Media, Inc.*,
  No. C-02-5273-MJJ, 2005 WL 6217120 (N.D. Cal. Jan. 24, 2005)......................................21

*Trading Technologies International, Inc. v. eSpeed, Inc.*,
  595 F.3d 1340 (Fed. Cir. 2010)....................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996).................................................................................2, 13

STATUTES

35 U.S.C. § 112(f)...........................................................................................14, 15

35 U.S.C. § 112, ¶ 6.........................................................................................14, 15

OTHER AUTHORITIES

37 C.F.R. § 116(b) (1992) ......................................................................................8

Manual of Patent Examining Procedure § 714.16 ...........................................................8

# I.      INTRODUCTION

Rather than meaningfully participate in the claim construction process, which involves both parties proposing language to clarify disputed claims, CoolIT largely maintains that the Court should adopt an unexplained and unsupported "plain and ordinary meaning."  Not only is CoolIT's "plain and ordinary meaning" for the disputed terms usually vague, it often runs counter to the actual intention of the patent applicant, as demonstrated by the intrinsic evidence.  Asetek's proposed constructions on the other hand are grounded in the intrinsic record, frequently relying on the words used by the patent applicant when describing his invention to the U.S. Patent and Trademark Office ("PTO").  Accordingly, the Court should adopt Asetek's proposed constructions.

# II.     STATEMENT OF RELEVANT FACTS

## A.      Technical Background

As described more fully in the parties' opening claim construction briefs (*see* Dkts. 125, 127), the general subject matter of the technology at issue pertains to devices that use liquid cooling to control the heat generated by computers during operation.  Prior art cooling devices had shortcomings, including problems with leakage and liquid expansion.  Asetek's and CoolIT's patents disclose different inventions that address prior art shortcomings in different ways.

## B.      The CoolIT Patent and the Nature of the Claimed Invention

CoolIT's '456 patent is titled "Pump Expansion Vessel" and primarily addressed problems caused by liquid expansion.  The Field of Invention explains that "[i]n a computer liquid-cooled system, for example, the coolant may have significant volume changes through temperature variances as the system operates. . . . [S]uch volume spikes must be accommodated."  CoolIT Br.,[1] Ex. 3 at col. 1, ll. 13-17.  The '456 patent accommodates such coolant volume spikes by use of a "resiliently, compressible member" in the inner chamber in the housing.  *Id.* at col. 1, ll. 7-9; col. 3, ll. 19-31 ("The member accommodates space in the pump housing, but can be compressed by

---

[1] Defendant CoolIT Systems, Inc.'s Amended Opening Claim Construction Brief for U.S. Pat. No. 8,382,456 ("CoolIT Br."), Dkt. 125.

expansion of the coolant, as may be caused by an increase in coolant temperature, within the chamber.").

## III.   ARGUMENT

### A.   Legal Standards

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  "The specification necessarily informs the proper construction of the claims" (*id.* at 1315-1316), though a court must, nevertheless, "avoid the danger of reading limitations from the specification into the claim" (*id.* at 1323).  The Federal Circuit also deems the prosecution history to be of "critical significance" to ascertaining "the meaning of the claims."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "[A]rguments made during the prosecution history . . . must be examined to ascertain the true meaning of what the inventor intended to convey in the claims."  *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1438 (Fed. Cir. 1988).

### B.   "Heat Exchanger"

| Asetek | CoolIT |
|---|---|
| "A liquid cooled device in thermal contact with a heat source and that transfers heat from the heat source to a liquid." | Plain and ordinary meaning |

CoolIT asks the Court to adopt the supposed "plain and ordinary meaning" of the term "heat exchanger" and, without offering any support showing a plain and ordinary meaning, seeks to broaden the definition to encompass much more than was intended or disclosed by the inventor and Examiner during prosecution of the '456 patent.  Asetek's definition, in contrast, gives effect to the meaning of the term as consistently used by the inventor when describing his invention to the PTO and the public.

#### 1.   The intrinsic evidence supports Asetek's proposed construction.

The Federal Circuit has consistently held that claims should be construed in light of the intrinsic evidence, including the specification and the prosecution history.  *See Phillips*, 415 F.3d at

1314; *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (stating the patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history"); *Southwall Techs., Inc. v. Cardinal IG, Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history . . .").  Substantial evidence in the '456 specification and prosecution history demonstrates that when the inventor used the term "heat exchanger," he meant a liquid cooled heat exchanger in thermal contact with a heat source.  *Nystrom* shows exactly why the Court should reject CoolIT's request to broaden its claims and instead adopt Asetek's construction for "heat exchanger."

In *Nystrom*, the patentee sought a construction for the term "board" that included not only boards made of wood, but also boards made of other materials.  *Nystrom*, 424 F.3d at 1142.  Relying on the plain and ordinary meaning of "board," the patentee argued that the claimed "board" was not limited to boards made of wood, and that it was error for the district court to rely on statements made in the specification and prosecution history to limit "board" to wood where there was no "clear disavowal of [the broader] claim scope."  *Id.*  The district court and Federal Circuit disagreed. Pointing to statements made in the written description, the background of the invention, and during the prosecution history, the Federal Circuit rejected the patentee's argument, finding that "[the patentee] is not entitled to a claim construction divorced from the context of the written description and prosecution history . . . [which] consistently use the term 'board' to refer to wood decking materials cut from a log."  *Id.* at 1143-45.  For the same reason, the "heat exchanger" recited in the claims of the '456 patent should be construed to mean "a liquid cooled device in thermal contact with a heat source and that transfers heat from the heat source to a liquid."

Although the '456 patent is directed to a computer cooling pump circuit that accommodates volume spikes by use of a "resiliently, compressible member" in the inner chamber in the housing (CoolIT Br., Ex. 3 at, *e.g.*, col. 1, ll. 7-9; col. 3, ll. 28-31), one component of the claimed cooling pump circuit is a "heat exchanger."  As in *Nystrom*, the '456 specification and prosecution history make it clear that the inventor intended the claimed heat exchanger to be a specific type, i.e., one that is liquid cooled, in thermal contact with a heat source, and transferring thermal energy from the heat

source to the cooling liquid.  For example, the Summary of the Invention twice describes "a broad aspect of the **present invention**" as including the "**liquid cooled** heat exchanger," i.e., a "**liquid cooled** heat exchanger and a pump circuit *providing liquid coolant to the* **liquid cooled** *heat exchanger*." *Id.* at col. 1, ll. 30-33 and ll. 43-46 (emphasis added).[2]  No heat exchanger, other than the "liquid cooled heat exchanger," is described in the Summary of Invention, or is described as being part of "the present invention."  References to a "present invention" strongly suggest that the claimed invention is limited accordingly.  *See Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 871, (Fed. Cir. 2010); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).  Furthermore, the "liquid cooled heat exchanger" was intended and understood to transfer heat from the heat source to a cooling liquid ("such that the liquid coolant moves to *accept thermal energy from a heat source 140*").  CoolIt Br., Ex. 3 at col. 3, ll. 5-7.

In addition, for more than four-and-a-half years, from his filing of his patent application in May 2007 through a Notice of Allowance mailed on December 26, 2012, the inventor always described and limited his claimed "heat exchanger" as "*a liquid cooled* heat exchanger . . . ." *See, e.g.*, Declaration of Jeffrey D. Smyth in Support of Plaintiffs' Responsive Claim Construction Brief re: U.S. Patent No. 8,382,456 ("Smyth Decl."), Ex. A at 9-13 (claims 16-51) (emphasis added); Ex. B at 4-7 (claims 16-51) (emphasis added); Ex. C at 2-4 (all pending claims) (emphasis added); Ex. D at 2-4 (all pending claims) (emphasis added); Ex. E at 2-5 (all pending claims).[3]  Furthermore, when the Examiner entered his Notice of Allowance on December 26, 2012, every pending claim still recited a "*liquid cooled* heat exchanger."  *See* Smyth Decl., Ex. F.  The inventor's continuous

---

[2] While the Summary of Invention twice refers the "broad aspect of the present invention" as including the "liquid cooled heat exchanger," the embodiments are separately described in the following section in the patent, the Detailed Description of Various Embodiments. CoolIT Br., Ex. 3 at cols. 1-3, particularly col. 1, ll. 30-33; 42-46; 57-61.

[3] Independent claim 1 recited a "**liquid cooled** heat exchanger" from the day the application was filed in May 2007 (Smyth Decl., Ex. A at 11 (claim 34)) through the post-allowance amendment in January 2013; independent claim 17 was added in the October 2, 2012, amendment (Smyth Ex. E at 4-5 (claim 57)) and recited a "**liquid cooled** heat exchanger" through the post-allowance amendment in January 2013 (Smyth Decl., Ex. F at 1).

1    and persistent use of the modifier "liquid cooled" before "heat exchanger" demonstrates that for

2    nearly the entire pendency of his application, he considered the heat exchanger to be liquid cooled

3    (i.e., a device that transfers thermal energy from a heat source to the "liquid coolant").

4            The prosecution history also establishes that the Examiner and inventor understood and

5    intended the "heat exchanger" recited in the claims to be one in thermal contact with a heat source.

6    The Examiner initially rejected the application that issued as the '456 patent on obviousness grounds

7    because, *inter alia*, the recited "heat exchanger" was disclosed in prior art U.S. Patent 6,725,682

8    ("the '682 patent") issued to the same inventor (Scott).  The '682 patent is cited in the description of

9    the embodiments and incorporated by reference in the '456 patent.  CoolIT Br., Ex. 3 at col. 3, l. 10.

10   In the '682 patent, inventor Scott explains in the abstract that "[t]he fluid heat exchanger transfers

11   heat from a hot portion of the surface of the electronic device to a fluid and has a body through

12   which the fluid may be circulated."  Smyth Decl., Ex. G at cover page.  Figures 2A and 2B of the

13   '682 patent depict the heat exchangers (218 and 258) mounted in thermal contact with a heat

14   source—i.e., the CPU microprocessor (214 and 254)—and the associated text explains that "a heat

15   exchanger 218, 258 [is] mounted in contact with the CPU microprocessor 214, 254."  *Id*. at Figs. 2A

16   and 2B, col. 5, l. 66 – col. 6, l. 1.  In making his obviousness rejection, the Examiner specifically

17   cited those heat exchangers (218 and 258 in Figs. 2A and 2B) mounted in thermal contact with the

18   CPUs and transferring heat to a cooling liquid as teaching the "heat exchanger" recited in the

19   application that issued as the '456 patent.  Smyth Decl., Ex. H at, *e.g.*, 2 and 3.  Annotated and

20   highlighted Figures 2A and 2B from the '682 patent are shown below, in which the "heat

21   exchangers" (218 and 258) in thermal contact with the CPUs and cited in the Examiner's rejection

22   are highlighted in yellow:

23

24

25

26

27

28

PLS.' RESP. TO COOLIT'S CLAIM CONSTR. BR.
CASE NO. 3:12-CV-04498-EMC



FIG. 2A



FIG. 2B

Smyth Decl., Ex. H at, *e.g.*, 2 and 3 (Examiner's rejection); Ex. G at Figs. 2A and 2B.

Notably, the Examiner, in making that rejection, did not cite the separate component that inventor Scott referred to as "chiller" modules (220 and 260), which cool the heated liquid by accepting thermal energy from it and are *not* a "heat exchanger" in thermal contact with the CPU (or any other heat source). Smyth Decl., Ex. H; Ex. G at col. 5, l. 65 - col. 6, l. 1 (differentiating between "heat exchanger 218, 258 mounted in contact with the CPU microprocessor 214, 254; a chiller module 220, 260; . . ."). Thus, it is clear from both the '456 specification and the prosecution history that the "heat exchanger" element refers to the device in thermal contact with the heat source and that transfers heat from the heat source to a liquid. Just as the *Nystrom* court rejected the patentee's attempt to broaden his claimed "board" during claim construction, this Court should interpret "heat exchanger" in the same manner it was used by the inventor and Examiner throughout prosecution of the '456 patent by adopting Asetek's proposed construction.

2.      **CoolIT is attempting to improperly expand the scope of "heat exchanger" based on an unexplained amendment made after this litigation began, and after receiving a Notice of Allowance.**

CoolIT should not be permitted to improperly broaden the definition of "heat exchanger" for litigation purposes, in contravention of the specification and over four-and-a-half years of prosecution, by resorting to an unexplained amendment requested at the very end of prosecution, after receiving a Notice of Allowance, and after this litigation had already commenced. As explained above, the '456 inventor Scott always described his claimed "heat exchanger" as "liquid cooled" (in the claims and specification) for four-and-a-half years, from the filing of the patent application in May 2007 through the December 26, 2012, Notice of Allowance. But nearly four months *after* Asetek filed this suit against CoolIT,[4] and after the Examiner's Notice of Allowance on December 26, 2012, the applicant's attorney, in a January 14, 2013, interview with the Examiner, asked that the "liquid cooled" limitation be dropped from the claimed "heat exchanger." Smyth Decl., Ex. I. The prosecution history contains no justification or explanation for the applicant's last-minute, post-allowance deletion (*id.*), and thus violated the Manual of Patent Examining Procedure

---

[4] Asetek filed this suit against CoolIT on August 27, 2012. Dkt. 1.

("MPEP") § 714.16.[5]  Soon thereafter, in the present litigation, CoolIT amended its counterclaims to assert the '456 patent against Asetek on the very day the patent issued.  Dkt. 72.  The Federal Circuit, however, does not permit attempts like CoolIT's to expand claim scope in last-minute deletions to claim language without explanation or justification in the PTO file history.

In *Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094 (Fed. Cir. 2003), the trial court and Federal Circuit rejected patentee Genzyme's argument that its claims had been broadened by an "eleventh-hour amendment" late in prosecution, after a final rejection had been received from the PTO.  *Id.* at 1094.  The claims at issue involved chromosomal integration, and Genzyme's last-minute amendment deleted from the claims a limitation (i.e., introduction of exogenous DNA into a host cell) that had been recited in the claims since the day the application was filed.  *Id.* at 1101, 1103.  The claims, specification, and prosecution history all demonstrated that the claimed chromosomally integrated DNA required the introduction of exogenous DNA into a host cell.  *Id.* Indeed, the Summary of Invention described the "present invention" as involving introduction of exogenous DNA into the host cell.  *Id.* at 1099.[6]  After a final rejection of the claims,  Genzyme filed an amendment that deleted a term corresponding to the exogenous DNA limitation from the claims.  *Id.* at 1103.  The Examiner agreed to the amendment during an interview, but there was no explanation for the amendment in the file history, in violation of PTO Rules requiring such amendments to be explained in the public record if they broaden the claim(s).  *Id.* (citing 37 C.F.R. § 116(b) (1992)).

---

[5] MPEP § 714.16 states:  "As to amendments [after allowance] affecting the disclosure, the scope of any claim, or that add a claim, the remarks accompanying the amendment must fully and clearly state the reasons on which reliance is placed to show: (A) why the amendment is needed; (B) why the proposed amended or new claims require no additional search or examination; (C) why the claims are patentable; and (D) why they were not presented earlier."  Smyth Decl., Ex. J.  While the MPEP is not binding on this Court, courts can take judicial notice of provisions from the MPEP.  *See In re Hubbell*, 709 F.3d 1140, 1146 (Fed. Cir. 2013).

[6] The *Genzyme* opinion describes the claim limitation there at issue in both sophisticated cloning terms ("the invention involves 'cloning and expressing the #-Gal A coding sequence in eukaryotic host cell expression systems'") and more general terms ("introducing exogenous [DNA/cloned sequences/genes] into a host cell").  These varying descriptions in the opinion refer to the same limitation.  *See Genzyme*, 346 F.3d at 1099.

PLS.' RESP. TO COOLIT'S CLAIM CONSTR. BR.
CASE NO. 3:12-CV-04498-EMC

Later, during claim construction in district court, Genzyme argued that the claims had been broadened by its last-minute deletion/amendment and no longer included the exogenous DNA limitation.  *Id.*  However, both the trial court and the Federal Circuit rejected Genzyme's argument, and construed the claims to require the deleted exogenous DNA limitation.  *Id.* at 1097, 1103.  In an opinion by now-Chief Judge Rader, the Federal Circuit stated that "[c]ontrary to Genzyme's position, this eleventh-hour amendment did not operate to broaden the claims to eliminate the requirement of insertion of an exogenous gene into a host cell. . . . A clarifying amendment at the last moment could not negate [the] extensive public record."  *Id.* at 1103.  The court reasoned that the lack of comment in the public record "suggests that the examiner felt this last-minute change did not alter the scope of the claims."  *Id.*

The facts in this case are remarkably similar to those in *Genzyme.*  Like the late and unexplained amendment in *Genzyme*, CoolIT's post-allowance and unexplained amendment to remove the phrase "liquid cooled" from the claimed "heat exchanger" should not be permitted or construed to broaden the scope of the claims to omit "liquid cooled."  As explained above, independent claim 1 recited a "***liquid cooled*** heat exchanger" from the day the application was filed in May 2007 (Smyth Decl., Ex. A at 11 (claim 34)) through the post-allowance amendment in January 2013; independent claim 17 was added in the October 2, 2012, amendment (Smyth Decl., Ex. E at 4-5 (claim 57)) and recited a "***liquid cooled*** heat exchanger" through the post-allowance amendment in January 2013; the Summary of Invention twice describes "a broad aspect of the present invention" as including the "liquid cooled heat exchanger," and no other heat exchanger; throughout prosecution, the inventor referred to the claimed heat exchanger as "liquid cooled"; and there is no explanation for the eleventh-hour deletion of "liquid cooled" in the PTO file history, in violation of PTO Rules (*see* discussion and citations at pp. __, *supra*).  Yet CoolIT is now, in litigation, attempting to expand the scope of "heat exchanger" to cover not only the intended heat exchangers in thermal contact with a heat source, but other components the inventor Scott typically referred to as "heat sinks" or "chillers" that are not in contact with a heat source.  As in *Genzyme*, this Court should give "heat exchanger" the same meaning set forth in the claims, Summary of Invention, specification, and prosecution history throughout prosecution, and not permit CoolIT's

litigation-induced and belated attempt to broaden the scope of the claimed "heat exchanger" via the unexplained, "eleventh-hour amendment."

> ### 3.    CoolIT's proposed "plain and ordinary meaning" construction is inconsistent with the intrinsic evidence.

CoolIT contends that the single "heat exchanger" recited in the claims need not be in thermal contact with a heat source (and need not absorb heat from the heat source into the coolant). CoolIT Br. at 7. The thrust of CoolIT's argument is that, in addition to a component in contact with a heat source (and that absorbs heat from the heat source into the coolant), the claimed "heat exchanger" may also be one that draws heat out of the *heated coolant*, i.e., a component that inventor Scott often referred to as a "heat sink" or "chiller." *See, e.g.*, Smyth Decl., Ex. K (Scott U.S. Patent No. 6,971,243 titled "Heat Sink") at col. 1, ll. 20-26 ("Where liquid coolant is used, for example, the liquid is pumped through a block on the heat source where it becomes heated and then the heated liquid is pumped to a ***heat sink*** located at some distance from the block. Once the heated liquid arrives at the ***heat sink***, heat is conducted into the thermal plate and out into the fins wherein the heat is passed into a fluid such as an airflow passing through the fins.") (emphasis added)[7]; Smyth Decl., Ex. G at Figs. 2A and 2B and associated text at col. 5, l. 65 – col. 6, l. 19, differentiating between "chiller module 220, 260" and "heat exchanger 218, 258 mounted in contact with the CPU microprocessor 214, 254.").

CoolIT relies heavily on Figure 4 of the '456 patent, which shows the claimed liquid cooled heat exchanger 139 in thermal contact with a heat source 140 (and which *accepts* thermal energy from the heat source), and a separate heat sink 142 (which accepts thermal energy from the *heated coolant*) positioned later in the pump circuit. CoolIT Br., Ex. 3 at Fig. 4. The associated text for Figure 4 explains that a "pump 110 may be used in a liquid cooled computer 138 to drive liquid coolant between heat exchangers such as heat exchanger 139 in thermal communication with a heat source 140 and a heat sink 142 . . . such that the liquid coolant moves to *accept thermal energy* from

---

[7] Like the Scott '682 patent, the Scott '243 patent is cited in the description of embodiments and incorporated by reference in the Scott '456 patent asserted against Asetek. CoolIT Br., Ex. 3 at col. 3, l. 10.

1  a heat source 140 and *unload that thermal energy at heat sink 142.*"  *Id.* at col. 2, l. 63 - col. 3, l. 7

2  (emphasis added).  CoolIT's attempt to rely on this language is misplaced.  Although that text

3  generally refers to the two structures in Figure 4 (other than the pump) as heat exchangers, it

4  specifically refers to the first as "*heat exchanger* 139 in thermal communication with the heat source

5  140," and to other as "*heat sink* 142," which is where thermal energy is "unloaded" from the heated

6  coolant.  *Id.* at col. 2, ll. 65-67 (emphasis added).



**FIG. 4**

17        For all these reasons, the Court should adopt Asetek's construction and construe "heat

18  exchanger" to mean "a liquid cooled device in thermal contact with a heat source and that transfers

19  heat from the heat source to a liquid."  This is based directly upon the inventor's use of the term and

20  the intrinsic evidence (including the Examiner's rejection), and reject CoolIT's post-hoc attempt to

21  broaden this term in litigation.

22        C.        **"Inlet Through the Housing Opening to the Reservoir"**

| Asetek | CoolIT |
|---|---|
| "Inlet from outside the housing allowing coolant to flow directly into the reservoir" | Plain and ordinary meaning |

26        Rather than offer a construction for this disputed claim term, CoolIT again merely recites

27  "plain and ordinary meaning," and accuses Asetek of inserting limitations into the claims not

1  supported by the intrinsic record.  CoolIT Br. at 9.  Yet it is Asetek's proposed construction that

2  accurately reflects the way the inventor described his invention to the PTO and the public.

3       On August 30, 2010, during the prosecution of the '456 patent, the Examiner rejected all of

4  the pending claims.  Smyth Decl., Ex. H at 2.  In response to the Examiner's rejection, the applicant

5  amended the claim to recite this very disputed claim term, explaining the claim "has been amended

6  to clarify that the coolant circuit defines **a coolant flow path through the reservoir: in through an**

7  **inlet**, past the member and **out through a port**, which is separate from the inlet.  This provides the

8  benefit that **coolant flows directly through the reservoir** and into contact with the compressible

9  member on every circuit."  Smyth Decl., Ex. C at 5 (emphasis added).

10       This language from the prosecution history proves Asetek's construction to be the correct

11  one.  First, for the coolant to enter the reservoir "in through an inlet" (as explained in the applicant's

12  explanation of his amendment quoted above), the coolant must be coming into the reservoir housing

13  inlet from somewhere, i.e., from "outside."  Second, the "allow[] coolant to directly flow into the

14  reservoir" language of Asetek's construction is also supported by the applicant's explanation that

15  "coolant flows directly through the reservoir."  *Id.* at 5.

16       Thus, Asetek's proposed construction relies on the applicant's own explanations made to the

17  PTO while seeking allowance of the claims, and should be adopted for that reason.  The public and

18  Asetek are entitled to rely upon the applicant's explanation of the claim terms during prosecution,

19  and CoolIT should be bound by them.  *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325,

20  1337 (Fed. Cir. 1998).  In *Desper Products*, as in this case, the applicant's prosecution counsel filed

21  a response in the PTO explaining the meaning of claim terms in order to overcome the Examiner's

22  obviousness rejection.  Later, during litigation, the patentee attempted to argue a different meaning

23  for those claim terms, contending that the prosecuting attorney's explanations should not govern

24  their interpretation.  *Id*. at 1334.  Both the trial court and the Federal Circuit rejected these litigation-

25

26

27

28

PLS.' RESP. TO COOLIT'S CLAIM CONSTR. BR.
CASE NO. 3:12-CV-04498-EMC

induced arguments, and construed the claim terms the same as the representations/explanations made

during prosecution.  *Id.* at 1336.[8]

Furthermore, holding CoolIT to its explanations of the claimed invention during prosecution

is "interpreting claim language, not importing limitations into the claim."  *Springs Window Fashions*

*LP v. Novo Industries, L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003).  As in *Springs Window*, "[t]here is

nothing in the prosecuting attorney's remarks that is at odds with anything in the specification or the

claims" of the '456 patent.  *Id.*  "The public notice function of a patent and its prosecution history

requires that a patentee be held to what he declares during the prosecution of his patent."  *Id.* at 995.

The court explained that competitors are entitled to rely on the patentee's explanations of the

claimed invention during prosecution when ascertaining the scope of the patent and the degree of

lawful conduct:

> The prosecution history constitutes a public record of the patentee's
> representations concerning the scope and the meaning of the claims, and
> competitors are entitled to rely on those representations when ascertaining the
> degree of lawful conduct. . . . Were we to accept [the patentee's] position, we
> would undercut the public's reliance on a statement that was in the public
> record and upon which reasonable competitors formed their business
> strategies.

*Id.* at 995 (citing *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir.

2000); *Vitronics*, 90 F.3d at 1583 ("the claims, specification, and file history . . . constitute the public

record of the patentee's claim, a record on which the public is entitled to rely.")).

As in *Desper Products*, *Springs Window*, and the other Federal Circuit precedent cited above,

this Court should construe this disputed claim term ("inlet through the housing opening to the

reservoir") to mean "inlet from outside the housing allowing coolant to flow directly into the

reservoir."  This construction reflects the applicant's specific explanation of the disputed term during

prosecution, and doing so is "interpreting claim language, not importing limitations into the claim"

---

[8] The *Desper Products* court also rejected the patentee's argument that the prosecuting attorney's
explanations should not have been used to interpret the claims because "the amendment that
precipitated the remarks did not end the prosecution."  *Desper Prods.*, 157 F.3d at 1335.  Any such
argument by CoolIT should similarly be rejected.

13

as CoolIT contends.  *Springs Window*, 323 F.3d at 996.  Adopting Asetek's claim construction would also avoid jury confusion and prevent CoolIT from arguing a claim scope that differs from the public record upon which competitors, including Asetek, are entitled to rely.  *See id.*

### D.    "Retainer"

| Asetek | CoolIT |
|---|---|
| "Governed by 35 U.S.C. § 112, ¶ 6.<br><br>Claimed function in claim 1 – 'configured to hold the resiliently compressible member in position away from moving out of the inner chamber or into a position blocking fluid flow through the pump.'<br><br>Claimed function in Claim 17 – 'configured to prevent the resiliently compressible member from blocking a fluid flow through the port in the housing wall.'<br><br>Structure corresponding to function – standoffs (ridges '52' of FIGS. 1 and 3)" | Plain and ordinary meaning |

With regard to the disputed term "retainer," CoolIT again makes no attempt to provide a definition, requesting an unexplained "plain and ordinary meaning," and relying solely on its argument that the applicant did not specifically refer to 35 U.S.C. § 112(f) (formerly 35 U.S.C. § 112 ¶ 6)[9] in the specification.  However, even though the inventor did not use the word "means," the claimed "retainer" limitation is a means-plus-function limitation under Federal Circuit law

---

[9] The language of the former 35 U.S.C. § 112 ¶ 6 and the current 35 U.S.C. § 112(f) is identical, and states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function *without the recital of structure, material, or acts in support thereof*, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f) (emphasis added).

construing "retaining mechanism" as a means-plus-function limitation.  Accordingly, "retainer" should be limited to the structure disclosed in the specification.

> **1.     Claim limitations that are expressed in functional terms without reciting sufficient structure are construed as means-plus-function limitations, even where the word "means" is not used.**

Claim terms expressed in functional terms that do not recite sufficient structure should be construed as means-plus-function limitations.  35 U.S.C. § 112 ¶ 6 (now 35 U.S.C. § 112(f)).  A functional claim term that does not include the word "means" triggers the rebuttable presumption that it is not a means-plus-function limitation.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).  "Although such a presumption is helpful in beginning the claim construction analysis, it is not the end of the inquiry."  *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213 (Fed. Cir. 1998) (finding functional element a means-plus-function limitation, even though "means" was not recited in claim).  Lack of "means" language in a claim "does not *prevent* a limitation from being construed as a means-plus function limitation."  *Id.* at 1214 (emphasis in original, citation omitted).  The presumption is rebutted by demonstrating, by a preponderance of the evidence, that the claim term "fails to 'recite sufficiently definite structure,' or else recites 'function without reciting sufficient structure for performing that function.'"  *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) (quoting *CCS Fitness,* 288 F.3d at 1369).

In *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 Fed. App'x 697, 703 (Fed. Cir. 2008), the Federal Circuit ruled that a claimed "retaining mechanism" (analogous to CoolIT's "retainer") did not recite sufficiently definite structure, such that the "retaining mechanism" was a means-plus-function limitation, and was thus limited to the corresponding structure in the specification (and its equivalents).  In reaching its decision, the Federal Circuit explained "the question is not whether 'retaining mechanisms' are physical structures but whether they are sufficiently definite structures."  *Id*.  In ruling that "retaining mechanism" was a functional term not sufficiently definite to connote structure (rather than mere function), the court first noted that "mechanism" was a "generic term," and that "'retaining[]' is also quite broad, meaning 'to hold back, keep, restrain.'  *E.g.*, *Webster's*

*Ninth New Collegiate Dictionary* 1006 (1990) (defining 'retain')." *Id.* at 703.[10]  Because the

patentee was unable to demonstrate that there was "a commonly recognized structure in the industry

for a retaining mechanism," the Federal Circuit affirmed the district court's construction, which

limited the term to the corresponding structure in the specification. *Id.* at 704.

Other Federal Circuit decisions are consistent with *Aspex*.  In *Mas-Hamilton*, the court found

that a "lever moving element" in a claim directed to a locking device did not have a "generally

understood structural meaning in the art."  *Mas-Hamilton*, 156 F.3d at 1213.  As the court noted,

"[t]he [claim] limitation is drafted as a function to be performed rather than definite structure or

materials."  *Id.*; *see also id.* at 1214 (finding "the claimed 'lever moving element' is described in

terms of its function not its mechanical structure").  As the court wrote:

> If we accepted La Gard's argument that we should not apply section
> 112, ¶ 6, a "moving element" could be any device that can cause the
> lever to move.  La Gard's claim, however, cannot be construed so
> broadly to cover every conceivable way or means to perform the
> function of moving a lever, and there is no structure recited in the
> limitation that would save it from application of section 112, ¶ 6.

*Id.*  And in *Massachusetts Institute of Technology and Electronics For Imaging, Inc. v. Abacus

Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006), the court construed "colorant selection mechanism"

to be a means-plus-function limitation, even though "means" was not recited in the claim, because

the term "colorant selection" was not defined in the specification, had no dictionary definition, and

there was no suggestion that it has a generally understood meaning in the art.  *Id.*  The same

rationale explained in these cases applies here.

As in the above cases, the term "retainer," standing alone, does not connote or convey any

common meaning or structure in the mechanical arts.  *See* Declaration of Donald E. Tilton in

Support of Plaintiff's Responsive Claim Construction Brief re: U.S. Patent No. 8,382,456 ("Tilton

---

[10] The *Aspex Eyewear* court's review of dictionary definitions as an initial step in its means-plus-function analysis is consistent with the Federal Circuit's analyses in prior means-plus-function cases. *See Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) ("In *Greenberg* and subsequent cases, we have looked to the dictionary to determine if a disputed term has achieved a recognition as a noun denoting structure, even if the noun is derived from the function performed.").

Decl."), ¶ 11.  "In the field of mechanical engineering, the term 'retainer' could mean any one of a great multitude of possible structures or mechanisms for retaining something in place.  A 'retainer,' without further description or explanation, does not connote any particular structure or class of structures."  *Id.*  As Asetek's expert explains, "[f]rom the language of the claims of the '456 patent alone, it is not clear to me, nor would it have been clear to a person of ordinary skill in the art in 2006-07, how the recited 'retainer' would be structured or implemented in the claims of the '456 patent."  *Id.*, ¶ 12.  It is only after reviewing the ridges 52 in Figures 1 and 3 in the '456 patent (and associated text) that may one understand and envision the "retainer" structure recited in the claims. *Id.*, ¶¶ 13-15.

Under *Aspex Eyewear* (construing "retaining mechanism" to be a means-plus-function limitation), *Mas-Hamilton*, and *Massachusetts Institute of Technology*, and because Asetek has proven by a preponderance of the evidence that "retainer" does not have a commonly understood structure, "retainer" should be construed as a means-plus-function limitation, confined to the corresponding structures disclosed in the specification and equivalents.

### 2.    "Retainer" should be limited to the ridges disclosed in the '456 patent specification.

As explained in sections D.1, *supra*, "retainer" should be limited to corresponding structure disclosed in the '456 specification, i.e., the ridges 52 in Figures 1 and 3.  The two independent claims in the '456 patent include language describing the function to be performed by the retainer, but no structure to perform that function.  Independent claim 1 recites "a retainer . . . configured to hold the resiliently compressible member in a position away from moving out of the inner chamber or into a position blocking fluid flow through the pump. . . ."  Independent claim 17 recites ". . . a retainer [ ] configured to prevent the resiliently compressible member from blocking a fluid flow through the port in the housing wall."  CoolIT Br., Ex. 3 at claims 1 and 17.

Figures 1 and 3, and the associated brief description of those figures in the specification, are the only explanation of what the inventor meant by "retainer" in the '456 patent.  The specification explains that "a retainer may be formed or positioned within the chamber to hold the member in position away from moving out of the chamber or into a blocking position against the fluid ports. . . .

17

protrusions such as ridges 52 and spacer are positioned to retain member in a spaced relation from inlet 14 and port 28, even if member 20 is or becomes loose in the reservoir chamber." *Id.* at col. 3, ll. 56-61.  Annotated Figures 1 and 3 illustrate the ridges 52 that the inventor intended for the claimed retainer:



FIG. 1



**FIG. 3**

*Id.* at FIGS 1, 3 (annotations added).  As explained by Asetek's expert, it is only after reviewing the

specification and the "ridges" included in Figures 1 and 3 that a person of ordinary skill in the art

would understand what the inventor intended the claimed "retainer" to cover.  Tilton Decl., ¶ 13-16.

Thus, the scope of "retainer" should be limited to this disclosure.

E.     **"Flow Path Through the Pump Inlet Into the Reservoir, Past the**
       **Resiliently Compressible Member and Out the Port into the Impeller**
       **Chamber"**

| Asetek | CoolIT |
|---|---|
| "A flow path in which coolant flows through the pump inlet first into the reservoir, contacts the resiliently compressible member, and then flows out the port into the impeller chamber." | Plain and ordinary meaning |

CoolIT seeks to rely on the "plain and ordinary meaning" for this disputed claim term, and

incorrectly accuses Asetek of importing unnecessary limitations without support from the intrinsic

1    evidence.  CoolIT is mistaken.  To the contrary, Asetek's construction properly incorporates the

2    inventor's own explanation/clarification of this term during prosecution of the '456 patent, and

3    CoolIT should be held to those representations.  *Desper Prods.*, 157 F.3d at 1337; *Springs Window*,

4    323 F.3d at 995-996.

5         In an Office Action mailed on August 30, 2010, the Examiner rejected, *inter alia*,

6    independent claim 34 of the application (which issued as independent claim 1) on obviousness

7    grounds.  Smyth Decl., Ex. H at 2.  In response, and to overcome the Examiner's rejection, the

8    applicant amended application claim 34 by adding the very language of this disputed claim term.

9    Smyth Decl., Ex. C at 2.  In that same response, the applicant explained this amendment by stating:

10   "Independent claim 34 has been amended to clarify that **the coolant circuit defines a coolant flow**

11   **path through the reservoir: in through an inlet, past the member and out through a port**,

12   which is separate from the inlet.  This provides the benefit that coolant flows directly through the

13   reservoir and **into contact with the compressible member on every circuit**."  *Id.* at 5 (emphasis

14   added).  Rather than importing "additional limitations," Asetek's proposed construction merely

15   relies on the applicant's own explanation of this disputed claim term.  Furthermore, the applicant

16   argued that the flow sequence or "flow path" provided in the amendment overcame the prior art,

17   because the prior art cited by the Examiner "does not teach or even suggest the **fluid flow**

18   **path**/reservoir as presently claimed nor the benefits obtained therefrom."  *Id.*  Asetek's construction

19   is true to this explanation from the applicant, and includes the applicant's clarification/explanation of

20   both:

21         (1) the coolant "flow path" (sequence) into, through, and out of the reservoir; and

22         (2) that the coolant comes "*into contact* with the compressible member *on every circuit*."

23   Although the applicant made these very explanations of this disputed claim term during prosecution

24   (and to overcome obviousness rejections), CoolIT baldly asserts that Asetek's construction adds

25   "additional limitations" that lack support in the claim language or the prosecution history.  CoolIT

26   Br. at 11.  CoolIT could not be more wrong.  As shown in the applicant's response to the PTO

27   quoted above, applicant's own words fully supports Asetek's proposed construction.

28

1    Because Asetek's proposed construction properly describes the invention in the same way the

2    applicant did to the PTO to overcome prior art rejections, the Court should adopt it. *Desper Prods.*,

3    157 F.3d at 1337; *Springs Window*, 323 F.3d at 995-996.  Doing so is "interpreting claim language,

4    not importing limitations into the claim" as CoolIT contends. *Springs Window*, 323 F.3d at 996.

5    Adopting Asetek's claim construction would also avoid jury confusion and prevent CoolIT from

6    arguing a claim scope that differs from the public record upon which competitors, including Asetek,

7    are entitled to rely. *See id.*

8    For all these reasons, the Court should adopt Asetek's construction, and construe the disputed

9    term ("flow path through the pump inlet into the reservoir, past the resiliently compressible member

10   and out the port into the impeller chamber") to mean "a flow path in which coolant flows through the

11   pump inlet first into the reservoir, contacts the resiliently compressible member, and then flows out

12   the port into the impeller chamber."

13   **F.    "Reservoir"**

14

| Asetek | CoolIT |
|---|---|
| "a fluid compartment within the inner chamber that contains the resiliently compressible member" | "Region of the integrated element/housing not in normal fluid flow and available to accommodate fluid expansion" |

18   The term "reservoir" is used differently in the Asetek and CoolIT patents, and accordingly

19   should be given different definitions consistent with the ways in which the inventors used the term in

20   the patents. *See Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1105 (Fed. Cir. 2002) (finding that the

21   prosecution history of one patent was not relevant to construction of disputed claim terms from

22   another patent with similar subject matter); *Toshiba Corp. v. Lexar Media, Inc.*, No. C-02-5273-MJJ,

23   2005 WL 6217120 at *5 (N.D. Cal. Jan. 24, 2005) (finding a one-size-fits-all construction

24   inappropriate across multiple patents, even where they pertained to similar technology).  For this

25   reason, CoolIT's assertion that "reservoir" should be construed the same across the Asetek and

26   CoolIT patents should be rejected.  Moreover, the "plain and ordinary meaning" definition CoolIT

27   asks the Court to adopt for "reservoir" is not even supported by its own '456 patent, let alone the

28

1    Asetek patents or the extrinsic evidence.[11]  CoolIT's position is not only inappropriate, but is likely

2    to lead to juror confusion, which underscores the need for the Court to adopt Asetek's proposed

3    constructions for "reservoir."

4        CoolIT begins its argument by citing to a dictionary definition of reservoir, "a receptacle or

5    chamber for holding a liquid."  CoolIT Br. at 12 and Ex. 5 thereto.  CoolIT's dictionary definition,

6    however, does not support its proposed construction, particularly CoolIT's added requirement that a

7    reservoir be "not in normal fluid flow and available to accommodate fluid expansion."  CoolIT's

8    dictionary definition says nothing of the kind, and CoolIT is thus incorrect in contending that its

9    definition would be understood by "even a lay person."  *Id.* at 11-12.

10       Furthermore, while the '456 specification states that, in the context of the '456 patent, the

11   claimed reservoir can accommodate fluid volume spikes, nothing in the claims, specification, or

12   prosecution history suggests that the reservoir must be "not in normal fluid flow" (and CoolIT does

13   not argue otherwise).  In fact, the opposite is true.  During prosecution, the applicant explained that

14   "coolant flows directly through the reservoir and into contact with the compressible member **on**

15   **every circuit**," and that "the reservoir containing the compressible member cannot become isolated

16   from the pump circuit."  Smyth Decl., Ex. C at 5 (emphasis added).  Thus, CoolIT's "not in the

17   normal flow" limitation is not only unsupported, it is contradicted by the applicant's description of

18   the claimed invention and should be rejected.  *See Desper Prods.*, 157 F.3d at 1337; *Springs*

19   *Window*, 323 F.3d at 996.

20       Finally, CoolIT argues that some of Asetek's proposed construction for "reservoir" is

21   redundant in light of the surrounding words in the claims, but CoolIT acknowledges that the claims

22   as a whole require a reservoir that is in the inner chamber and contains the resiliently compressible

23   member (just as Asetek has proposed).  While Asetek acknowledges a minor redundancy, given that

24   the jury will be asked to consider different Asetek and CoolIT patents that use the term "reservoir"

25   differently, and given that CoolIT is attempting to conflate the meaning of "reservoir" across the

26

27   _____

     [11] Although CoolIT actually proposes a construction for this claim term, it asserts that its
28   construction is the plain and ordinary meaning of the term.

patents, it is appropriate for the Court's construction of "reservoir" in the '456 patent to keep the distinction clear and to incorporate this minor redundancy (which CoolIT admits are proper claim limitations).  This will avoid juror confusion and is particularly necessary given CoolIT's attempt to blend the terms of the Asetek and CoolIT patents.

Accordingly, the Court should adopt Asetek's construction and construe "reservoir" to mean "a fluid compartment within the inner chamber that contains the resiliently compressible member."

### G.    "Loose in the Inner Chamber"

| Asetek | CoolIT |
|---|---|
| "not tightly fitted in the inner chamber" | "Not adhered to the inner chamber" |

For "loose in the inner chamber," Asetek's construction incorporates the common meaning of "loose," and is consistent with the intrinsic evidence.  CoolIT's construction, in contrast, errs because it is based on a selective and incomplete misreading of the specification.

Asetek's construction ("not tightly fitted in the inner chamber") applies the commonly understood meaning of "loose."  *See* Smyth Decl., Ex. M at 686 (defining "loose" as "not tight fitting; having relative freedom of movement").  Asetek's construction is also consistent with the specification.  With respect to positioning the member within the inner chamber, the inventor's stated purpose/desire is to position the member so that it "remain[s] substantially in position without blocking fluid flow."  CoolIT Br., Ex. 3 at col. 3, ll. 50-51.  The specification lists three alternate methods for achieving this goal: (1) the member is secured to the inner chamber "by adhesive 50 applied at interfacing surfaces, interlock, fasteners, etc." (*id.* at col. 3, ll. 52-56); (2) the member is held in position by a "retainer" to prevent it from moving "into a blocking position against the fluid ports" (*id.* at col. 3, ll. 56-62); or (3) the member is "large enough . . . such that is cannot pass through any ports" (*id.* at col. 3, ll. 63-67) (i.e., the retainer is loose/not tightly fitted, but large enough not to pass through the ports).  Thus, Asetek's proposed definition of "not tightly fitted in the inner chamber" interprets the claim in accordance with the plain and ordinary meaning and is consistent with the intrinsic record.

CoolIT's proposed construction ("not adhered to the inner chamber") does neither.  CoolIT does not offer a plain and ordinary meaning of "loose."  Moreover, CoolIT points out in its brief that the specification indicates that the claimed resiliently compressible member may be loose or it may be "secured."  CoolIT Br. at 12-13.  The specification describes several ways that member 20 may be "secured":  "Thus, in one embodiment member 20 may be **secured** to the housing inner walls defining the inner chamber.  For example, the member may be fastened directly to the housing inner walls by **adhesive 50 applied at interfacing surfaces, interlock, fasteners, etc.**"  CoolIT Br., Ex. 3 at col. 3, ll. 52-56 (emphasis added).  CoolIT's proposed construction incorrectly assumes that the only way that the member may be "secured" is by adhesive, when it is clear from the specification that there are multiple ways that the member may be secured (including "interlock, fasteners, etc.").  CoolIT takes its overly-narrow assumption, and, relying on a false dichotomy between "secured" and "adhered" not present in the specification, arrives at the conclusion that "loose" must mean "not adhered."  This conclusion is inconsistent with the intrinsic record and runs counter to the plain and ordinary meaning of the word "loose" (not tight fitting, having freedom of movement).

Because Asetek's construction is consistent with both the ordinary meaning of "loose" and consistent with the intrinsic evidence, whereas CoolIT's construction is not, the Court should construe "loose in the inner chamber" to mean "not tightly fitted in the inner chamber."

**H.      "Urge Against"**

| Asetek | CoolIT |
|---|---|
| "Pushes against" | "Touching" |

The claim term "urge against" is used only once in the '456 patent—in claim 14—which recites "[t]he computer cooling system of claim 1 wherein the resiliently compressible member and the retainer **urge against each other** regardless of a degree of expansion or contraction of the cooling liquid."  CoolIT Br., Ex. 3 at claim 14 (emphasis added).  Asetek's proposed construction is consistent with the plain and ordinary meaning of "urge," which Webster's Dictionary defines as "to force or impel in an indicated direction."  Smyth Decl., Ex. M at 1296.  Thus, the term "urge" requires more than mere touching; it requires force.  Moreover, the surrounding language in claim 14

1    describes the resiliently compressible member and the retainer urging "against each other," leaving

2    no doubt that force is involved.

3          CoolIT has not attempted to support its construction with any definitions, presumably

4    because dictionaries and the common understanding of "urge against" do not support CoolIT's

5    construction.  Instead, CoolIT asserts, without citing any support, that the purpose of the retainer—to

6    "urge against" the resiliently compressible member and thereby "hold" it in place (CoolIT Br., Ex. 3

7    at col. 3, ll. 57-59)—can be accomplished with no more than touching between the retainer and the

8    resiliently compressible member.  That statement is not only unsupported and contrary to the

9    common understanding of the word "urge," but it also conflicts with the basic laws of physics.  In

10   any case, CoolIT has not provided any evidence from the intrinsic record that suggests that Court

11   should apply anything other than the plain and ordinary meaning of "urge" in construing "urge

12   against."

13         Accordingly, the Court should adopt Asetek's proposed construction and construe "urge

14   against" to mean "pushes against."  This construction comports with the common understanding of

15   the term "urge" and is consistent with the intrinsic record.

16   **IV.      CONCLUSION**

17         For all of these reasons, the Court should adopt Asetek's proposed constructions for each of

18   the disputed terms of the '456 patent.

19

20   Dated:  October 15, 2013                          Respectfully submitted,

21                                                     FINNEGAN, HENDERSON, FARABOW,
22                                                       GARRETT & DUNNER, LLP

23
                                                          */s/ Robert F. McCauley*
24                                                     Robert F. McCauley
25                                                     Attorneys for Plaintiffs
                                                       Asetek A/S and Asetek Holdings, Inc.
26

27

28