1   COOLEY LLP
    HEIDI L. KEEFE (178960) (hkeefe@cooley.com)
2   DANIEL J. KNAUSS (267414) (dknauss@cooley.com)
    Five Palo Alto Square
3   3000 El Camino Real
    Palo Alto, CA  94306-2155
4   Telephone:     (650) 843-5000
    Facsimile:      (650) 849-7400
5
    DENNIS McCOOE  (mccooe@blankrome.com)
6   (admitted *Pro Hac Vice*)
    JOEL DION (dion-j@blankrome.com)
7   (admitted *Pro Hac Vice*)
    BLANK ROME LLP
8   One Logan Square
    130 North 18th Street
9   Philadelphia. PA  19103
    Telephone:     (215) 569-5580
10  Facsimile:      (215) 832-5580

11  Attorneys for Defendant
    CoolIT Systems, Inc.
12

13              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
14               SAN FRANCISCO DIVISION

15  ASETEK HOLDINGS, INC. AND ASETEK       Case No.  3:12-cv-04498-EMC
    A/S,
16                                          **DEFENDANT COOLIT SYSTEMS,**
                    Plaintiffs,             **INC.'S NOTICE OF MOTION AND**
17                                          **MOTION FOR SUMMARY**
            v.                              **JUDGMENT OF NON-**
18                                          **INFRINGEMENT OF U.S. PAT. NOS.**
    COOLIT SYSTEMS INC.,                    **8,240,362 AND 8,245,764, NO**
19                                          **DAMAGES FOR NON-U.S. SALES,**
                    Defendant.              **NO LOST PROFITS, INVALIDITY OF**
20                                          **U.S. PAT. NO. 8,245,764, AND**
                                            **INFRINGEMENT OF U.S. PAT. NO.**
21                                          **8,382,456**

22                                          **Date:** July 24, 2014
                                            **Time:** 1:30 pm
23                                          **Courtroom:** 5, 17th Floor
                                            **Judge:** Hon. Edward M. Chen
24

25

26

27

28

    ASETEK HOLDINGS, et al. v. COOLIT
    SYSTEMS, INC. – 3:12-CV-04498-EMC         DEF'S MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF CONTENTS**

2

**Page**

3

NOTICE OF MOTION AND MOTION ................................................................1

4

MEMORANDUM OF POINTS AND AUTHORITIES ........................................1

5

I.    Introduction .................................................................................................1

6

II.   Relevant Facts Regarding Patents-In-Suit and Accused Products.............2

7

    A.    Asetek's Patents and Infringement Allegations ....................................2

8

    B.    CoolIT's Patent and Infringement Allegations ....................................2

9

III.  Legal Standard for Summary Judgment......................................................3

10

IV.   CoolIT's Products Do Not Infringe the Asetek Patents .............................4

11

    A.    CoolIT's Products Do Not Infringe Asetek's '362 Patent. ..................4

12

        1.    CoolIT's Products Lack a "Reservoir" (Claims 14, 15, and 17-19) ............4

13

        2.    CoolIT's Products Lack a Substantially Circular Passageway
            (Claims 14-15) and the Passageway Is Not on the Horizontal Wall

14

15

            (Claims 14-15 and 17-19) ...................................................................5

16

        3.    CoolIT's Products Lack an Impeller Whose Speed Is Configured to
            Be Varied (Claims 14-15) .................................................................7

17

    B.    CoolIT's Products Do Not Infringe Asetek's '764 Patent. ..................8

18

        1.    CoolIT's Products Lack a "Reservoir" (Claims 1-18) .................8

19

        2.    CoolIT's Products Lack Direct Fluid Coupling between the Pump

20

            Chamber and the Thermal Exchange Chamber (Claims 1-18). ..................8

21

V.    Even if CoolIT's Products Did Infringe, CoolIT's Sales of Allegedly Infringing

22

Products to Corsair (Hong Kong), a Foreign Company, on Foreign Soil Are Not

23

Infringing as a Matter of Law ...................................................................10

24

VI.   Asetek Is Not Entitled to Lost Profits ......................................................13

25

    A.    The *Panduit* Standard and Its Progeny ...............................................13

26

    B.    Application of *Panduit* – No Lost Profits for Asetek .........................15

27

VII.  The '764 Patent Is Invalid ........................................................................16

28

VIII. Asetek's Gen III and Gen IV Products Infringe the CoolIT Patent .........19

A.     Asetek's Gen III Products Have "a Mid-Portion Positioned Between and Mechanically Coupled with the Cap and the Base Member" ................................. 19

B.     Asetek's Gen IV Products Have "a Cap Defining a Recess at Least Partially Defining the Reservoir" ......................................................................................... 20

C.     Asetek's Gen IV Products Have a "Port" ............................................................ 21

IX.     Asetek Cannot Show Willful Infringement of the Asetek Patents....................................22

X.     Conclusion ........................................................................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

## TABLE OF AUTHORITIES

3

Page(s)

CASES

4

5

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
      682 F.3d 1003 (Fed. Cir. 2012).................................................................................. 23

6

*Bayer AG v. Elan Pharm. Research Corp.*,
      212 F.3d 1241 (Fed. Cir. 2000).................................................................................... 3

7

8

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
      707 F.3d 1342 (Fed. Cir. 2013).............................................................................. 21, 22

9

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
      442 F.3d 1301 (Fed. Cir. 2006).................................................................................... 3

10

*Fr. Telecom S.A. v. Marvell Semiconductor Inc.*,
      2014 U.S. Dist. LEXIS 52564 (N.D. Cal. Apr. 14, 2014) (Orrick, J.)........................... 11, 12

11

12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
      185 F.3d 1341 (Fed. Cir. 1999).............................................................................. 13, 14

13

*ImEx Trading Co. v. The Vessel, Beate Oldendorff*,
      841 F. Supp. 1151 (M.D. Fla. 1993) ........................................................................ 12

14

15

*In re Seagate Tech., LLC*,
      497 F.3d 1360 (Fed. Cir. 2007)................................................................................ 22

16

*Linear Tech. Corp. v. Micrel, Inc.*,
      2006 U.S. Dist. LEXIS 96860 (N.D.Ca. June 9, 2006) ........................................... 14

17

18

*MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicon Corp.*,
      420 F.3d 1369 (Fed. Cir. 2005)................................................................................ 12

19

20

*Micro Chem. v. Lextron, Inc.*,
      318 F.3d 1119 (Fed. Cir. 2003)................................................................................ 14

21

22

*Microsoft Corp. v. AT&T Corp.*,
      550 U.S. 437 (U.S. 2007).......................................................................................... 11

23

*MyMail, Ltd. v. Am. Online, Inc.*,
      476 F.3d 1372 (Fed. Cir. 2007).................................................................................... 3

24

25

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
      575 F.2d 1152 (6th Cir. 1978).............................................................................. 13, 15

26

27

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
      711 F.3d 1348 (Fed. Cir. 2013).............................................................................. 11, 12

28

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) (en banc) ................................................................. 13

*Rotec Indus. Inc. v. Mitsubishi Corp.*,
    215 F.3d 1246, 1251 (Fed. Cir. 2000) ...................................................................... 12

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ................................................................................... 3

**STATUTES**

35 U.S.C. § 102 ........................................................................................ 2, 16, 23

35 U.S.C. § 103 ........................................................................................ 2, 16, 23

35 U.S.C. § 271 ........................................................................................ 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ........................................................................................ 1, 3

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that Defendant CoolIT Systems, Inc. moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment of (1) non-infringement of Asetek's U.S. Pat. Nos. 8,240,362 and 8,245,764 for all accused products; (2) no damages for all sales made by CoolIT outside of the U.S.; (3) no lost profits damages; (4) invalidity of U.S. Pat. No. 8,245,764; and (5) infringement by Asetek's Gen III and Gen IV products of CoolIT's U.S. Pat. No. 8,382,456.  This Motion is based on the Memorandum of Points and Authorities set forth below, the supporting declaration of Joel L. Dion ("Dion Decl.") and exhibits thereto, and such other matters as may be presented at the hearing on CoolIT's motion and allowed by the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Asetek Holdings, Inc. and Asetek A/S (collectively "Asetek") sued CoolIT alleging that certain CoolIT products infringe two of Asetek's patents, U.S. Pat. Nos. 8,240,362 ("the '362 patent") and U.S. Pat. No. 8,245,764 ("the '764 patent") (collectively "the Asetek patents"). Asetek accuses CoolIT of infringement of claims 14, 15, and 17-19 of the '362 patent and claims 1-18 of the '764 patent and avers that it is entitled to lost profits a consequence.  CoolIT counterclaimed against Asetek for, *inter alia*, infringement by Asetek of CoolIT's U.S. Pat. No. 8,382, 456 ("the CoolIT Patent").  CoolIT accuses Asetek of infringing claims 17-19 of the CoolIT Patent.[1]  Discovery is now complete and the undisputed facts demonstrate that:

- CoolIT's accused products do not infringe the Asetek patents at least because the accused products lack the claimed "reservoir," "substantially circular passage," "passage on the horizontal wall," and "fluidly coupled pump chamber and thermal exchange chamber";

- CoolIT is not liable for damages for its sales to Corsair in the ordinary course because none of the allegedly infringing conduct occurs within the United States;

---

[1] CoolIT had, initially, accused Asetek of infringement of claims 1-19 of the CoolIT patent.  After completing fact discovery, however, CoolIT withdrew its assertion of claims 1-16.

ASETEK HOLDINGS, et al. v. COOLIT
SYSTEMS, INC. – 3:12-CV-04498-EMC                    1                    DEF'S MOTION FOR SUMMARY JUDGMENT

- Even if CoolIT were liable to Asetek, Asetek is not entitled to lost profits because of the availability of non-infringing alternatives;

- The '764 Patent is invalid under 35 U.S.C. §§ 102 and 103 because claims 1-19 are anticipated by or are obvious from U.S. Patent No. 7,544,049 to Koga; and

- Asetek infringes claims 17-19 of the CoolIT patent.

## II.    RELEVANT FACTS REGARDING PATENTS-IN-SUIT AND ACCUSED PRODUCTS

### A.    Asetek's Patents and Infringement Allegations

The Asetek patents relate generally to an improvement for a closed loop, pumped liquid cooling system for computers. *See* '764 patent, Ex. A to the Dion Decl., at col. 1, lns. 16-19; '362 patent, Ex. B to the Dion Decl., at col. 1, lns. 18-21. According to the Asetek patents, early liquid cooling solutions, while providing better cooling efficiency than the prior art systems, suffered from a number of shortcomings, including complexity, difficulty in installation, large size (which was difficult to accommodate in many computer cases), and the potential for leaks. *E.g.* '764 patent at col. 1, lns. 37-47; '362 patent at col. 1, lns. 39-49. Both Asetek patents are directed toward novel solutions to these shortcomings in the prior art systems.

Asetek has accused CoolIT's products that incorporate its ECO II and ECO III cooling heads (with the exception of certain rack-based products that use centralized pumping) of infringement. *See*, Initial Expert Report of Dr. Donald E. Tilton Regarding Infringement of U.S. Patent Nos. 8,240,362 and 8,245,764 ("Tilton Infringement Report"), attached as Ex. C to the Dion Decl. For purposes of this litigation, the parties have stipulated that, relative to the Asetek patents' claims, the ECO II and ECO III products are identical. D.E.# 169.

### B.    CoolIT's Patent and Infringement Allegations

CoolIT's patent is also directed, generally, to an improvement for a closed loop, pumped liquid cooling system. *See* CoolIT patent, attached as Ex. D to the Dion Decl. The CoolIT patent describes and claims one way to accommodate fluid expansion that occurs within these systems through the use of a resiliently compressible member, such as closed cell foam. *Id.* at col. 3, lns. 23-25.

CoolIT has accused Asetek's products that incorporate its Gen III and Gen IV cooling heads of infringement. *See* Expert Report of Dr. Himanshu Pokharna Regarding Infringement of CoolIT's U.S. Pat. No. 8,382,456 ("Pokharna Infringement Report")[2], attached as Ex. E to the Dion Decl.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

CoolIT is entitled to summary judgment if it can show that there are no disputes of material fact and it is entitled to judgment as matter of law. Fed. R. Civ. P. 56. To evaluate claims of patent infringement, the Court first construes the claims as a matter of law and then compares the claims as construed to the accused device(s). *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). The absence of even a single claim limitation precludes a finding of infringement. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). To prove infringement, the proponent bears the burden of proving that the accused products meet each element of each asserted claim. *Bayer*, 212 F.3d at 1247. With respect to summary judgment of non-infringement, "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006). This case presents a particularly compelling case for summary judgment because there is no material disagreement between parties (or their respective experts) about how the accused products operate. The facts required to establish CoolIT's entitlement to summary judgment of both non-infringement of Asetek's patents and infringement of CoolIT's patent were readily admitted or are implicitly acknowledged by Asetek's own expert. The Federal Circuit has repeatedly emphasized that such a case is particularly suited to summary judgment. *See, e.g.*, *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007). Similarly, with regard to CoolIT's other bases for summary judgment, the facts are not in dispute. All that remains is for

---

[2] At the Asetek 30(b)(6) deposition, the witness misidentified certain Asetek products, resulting in the inclusion of Asetek's Gen II, Gen III, and Gen IV products in Dr. Pokharna's report. The parties have resolved the confusion and agree that the Gen III and Gen IV products are at issue here.

1    the Court to assess the legal impact of those undisputed facts.

2    **IV.    COOLIT'S PRODUCTS DO NOT INFRINGE THE ASETEK PATENTS**

3           CoolIT's products do not infringe any of the asserted claims of the Asetek patents as they

4    have been interpreted by the Court.  CoolIT's products do not infringe any asserted claims of the

5    '362 patent at least because the accused products lack the claimed "reservoir," "substantially

6    circular passages," and passages that are "on the horizontal wall."  CoolIT's products do not

7    infringe any asserted claims of the '764 Patent at least because the accused products lack the

8    claimed "reservoir" and "fluidly coupled pump chamber and thermal exchange chamber".

9           **A.    CoolIT's Products Do Not Infringe Asetek's '362 Patent.**

10          **1.    CoolIT's Products Lack a "Reservoir" (Claims 14, 15, and 17-19)**

11          The Court concluded that the dictionary definition for "reservoir," "a receptacle or

12   chamber for holding a liquid or fluid," best captures the meaning of the term based on the

13   language of Asetek's patents.  D.E.# 155.  CoolIT's accused products do not include a receptacle

14   or chamber for ***holding*** a liquid or fluid.  The term "holding," particularly in the context of a

15   reservoir, connotes holding in the sense of storing something.  This is not what the supposed

16   "reservoir" identified in the accused CoolIT products does.  According to CoolIT's expert, "I

17   would not call the flow passages between a pump means to be a reservoir because it's not really

18   holding a liquid. It's continuously flowing all throughout."  Transcript of June 3, 2014 Deposition

19   of Dr. Himanshu Pokharna ("Pokharna Tr."), attached as Ex. F to the Dion Decl., at 70.  No

20   portion of the CoolIT pump head is "holding" the liquid.  Instead, during the operation of the

21   CoolIT device, the liquid continuously flows through all the fluid chambers and passageways

22   within the pump head and, in that sense, there is no reservoir. In fact, the volume of fluid in the

23   ***radiator*** of the accused CoolIT products is an order of magnitude larger than that in the pump

24   head.  *See* Rebuttal Expert Report of Dr. Himanshu Pokharna Regarding Non-Infringement of

25   Asetek's U.S. Patent Nos. 8,240,362 and 8,245,764 at 5, attached as Ex. G to the Dion Decl.

26   ("Pokharna Non-Infringement Rebuttal").  Therefore, if any part of CoolIT's products can be said

27   to act as a reservoir, i.e. a place for holding or storing the cooling liquid, the radiator is

28   performing the function of a reservoir, not the pump head, where no liquid is held during

1   operation of the products.  The area referred to as "reservoir" in all the figures of the Tilton

2   Infringement report can reasonably be termed as a flow passage, but not a "reservoir" as

3   construed by the Court.  As a result, CoolIT's accused products do not infringe claims 14, 15, or

4   17-19 of the '362 patent.

5           **2.      CoolIT's Products Lack a Substantially Circular Passageway (Claims
                      14-15) and the Passageway Is Not on the Horizontal Wall (Claims 14-**

6   **                 15 and 17-19)**

7           The upper chamber and lower chamber of CoolIT's accused products are not "fluidly

8   coupled by one or more passageways, at least one of the one or more passageways being

9   positioned on the horizontal wall."  The Court specified in its December 3, 2013 Order that

10  "[w]here the means of connection are specified, the Court concludes that that is the exclusive

11  means by which the coupling can be accomplished.  Thus, for claim 1 of the '362 patent, the

12  chambers must only be connected by a plurality of substantially circular passages and nothing

13  more." D.E.# 155 at 10.

14          In CoolIT's accused products, the upper and the lower chambers of the accused products

15  are fluidly connected via a single passageway. However, the passageway is not substantially

16  circular and is not on the horizontal wall separating the two chambers.

17          The passageway in the CoolIT products is not at all circular.  The decision to make the

18  channel non-circular was intentional and highly functional. Within the spatial constraints of

19  CoolIT's design, use of a substantially rectangular shape created a far larger opening than a

20  circular opening would in the same space.  As can be seen from the CAD files for the CoolIT

21  accused products, the passageway that connects the upper and lower chamber is amorphous, **not**

22  substantially circular:



Opening from
the pump chamber

Opening leading to the
intermediate plenum chamber

Passageway connecting the upper chamber and the intermediate
plenum chamber formed in between pump chamber and the heat exchange chamber

As can be seen clearly, it is not substantially circular or even remotely circular

Pokharna Non-Infringement Rebuttal at Ex. B, Fig. 2.  At his deposition, Asetek's expert, Dr. Tilton, testified that he believes that passageway is circular because it has rounded corners and/or edges.  Transcript of June 9, 2014 Deposition of Dr. Donald Tilton ("Tilton Tr."), attached as Ex. H to the Dion Decl., 81:2-8.  This tortured argument is simply not credible and makes a mockery of the plain English in the claim.

Moreover, CoolIT's fluid passageway extends from the vertical part of the upper passageway housing and not the horizontal wall separating the upper and the lower passageways. The Tilton Expert Report appears to identify the entire horizontal portion of the pump head as the "horizontal wall," presumably to support the argument that the passageway is "on" the horizontal wall. This is not the "horizontal wall" as specified by the '362 patent.  The '362 patent claims specify that the "horizontal wall" is the wall vertically separating the upper and the lower chambers in the pump head.  In the CoolIT accused products, to the extent there is a "horizontal wall" separating the two chambers, it ends at the end of the circular pump volute.   The passageway, however, starts just beyond the alleged "horizontal wall," on the vertical wall of the pump volute:



As can be clearly seen, the non-circular passageway is formed on the
vertical housing of the pump chamber and not the horizontal wall

Pokharna Non-Infringement Rebuttal at Ex. B, Fig. 1.

1
2
3
4
5
6
7
8
9



Horizontal wall

Substantially
circular passageway
on horizontal wall

Lower chamber of reservoir

Horizontal wall (reverse side)

10   Tilton Infringement Report at Ex. B, pg. 2

11   In fact, during his deposition, Dr. Tilton retreated from the position in his report and

12   testified that the supposed "reservoir" was only the portions of the cooling head that hold liquid,

13   Tilton Tr. at 74:21-77:3, confirming that the horizontal wall stops at the vertical wall where the

14   passageway starts.   The passageway extending from the pump chamber/upper chamber in

15   CoolIT's products is not on the horizontal wall, but is formed in the vertical section of the

16   housing for the pump/upper chamber and not the horizontal wall separating the upper and lower

17   chambers.

18               **3.      CoolIT's Products Lack an Impeller Whose Speed Is Configured to Be
                           Varied (Claims 14-15)**
19

20   CoolIT's accused products do not have an impeller whose speed is configured to be

21   varied.  The speed of the fans can be varied in some CoolIT products, such as the H60.  However,

22   the pump in CoolIT's products operates at a constant speed (in revolutions per minute) and,

23   therefore, the impeller is independent of the fan but its speed is not configured to be varied, as

24   required in Claim 14 of the '362 patent.  Therefore, CoolIT's products do not infringe Claim 14

25   of the '362 patent.  *See* Pokharna Non-Infringement Rebuttal at 7.  Dr. Tilton suggests that the

26   impeller speed can be varied by varying the current supplied to the pump by the motherboard.

27   Tilton Tr. at 101:22-102:10.  Even if true, this does not result in a product with an "impeller

28

1    whose speed is configured to be varied."  Rather, this reaffirms that the impeller speed is

2    configured to be constant, depending on the current supplied by the system.

3            **B.      CoolIT's Products Do Not Infringe Asetek's '764 Patent.**

4            **1.      CoolIT's Products Lack a "Reservoir" (Claims 1-18)**

5        The Court construed the term "reservoir" identically for both the '362 patent and the '764

6    patent.  Accordingly, for the same reasons that CoolIT's products do not infringe the "reservoir"

7    limitation of the '362 patent, they do not infringe the "reservoir" limitation of the '764 patent.

8            **2.      CoolIT's Products Lack Direct Fluid Coupling between the Pump
                       Chamber and the Thermal Exchange Chamber (Claims 1-18).**

9        The upper chamber and lower chamber of CoolIT's accused products are not "fluidly

10   coupled" or "coupled" as that term has been interpreted by the Court because there is an

11   intervening component in CoolIT's accused products.  The Court specified in its December 3,

12   2013 Order that "[w]here the means of connection are specified, the Court concludes that that is

13   the exclusive means by which the coupling can be accomplished."  D.E.# 155 at 10.  Asetek's

14   expert seems to conveniently ignore the Court's instruction that "[t]he parties, however, should be

15   mindful of the Court's ruling here that, where a means of coupling is specified, that is the

16   exclusive means of connection." *Id.* at 12.

17       All of the accused CoolIT products lack a direct fluid passage joining the pump chamber

18   to the heat exchange chamber.  Instead, these products use an intermediate member, which forms

19   an intermediate chamber vertically displaced from the pump chamber and also vertically

20   displaced from the thermal exchange chamber.  This intermediate chamber is sandwiched

21   between the pump chamber and the thermal exchange chamber:

22

23

24

25

26

27

28



Pokharna Non-Infringement Rebuttal at Ex. B, Fig. 5.

The intermediate chamber serves two critical roles in the CoolIT pump head design. Pokharna Non-Infringement Rebuttal at 9.  First, the intermediate plenum chamber provides the role of a plenum and ensures that the coolant can be substantially uniformly distributed in all the channels formed by the fins on the inside of the heat exchange interface. *Id*.  Second, this intermediate plenum chamber is formed substantially in the center of the fins such that the cold coolant can enter the heat exchange chamber at the center of the CPU where the CPU temperature is the likely to be highest, which is important to cooling efficiency. *Id*.

Fluid from the pump chamber exits via the non-circular passageway on the vertical housing of the pump chamber and enters the intermediate plenum chamber formed between the top of the intermediate member and the impeller housing. *Id*.  From the intermediate plenum chamber the fluid enters the thermal exchange chamber.  Therefore, there is no fluid coupling between the pump chamber and the thermal exchange chamber (as constructed by court, the Claim 1 of the '764 patent specifies direct fluid coupling between the pump chamber and the thermal exchange chamber, which is not the case here). *Id*.  At his deposition, Dr. Tilton admitted that this intermediate area was a "chamber" as that term is used in the '764 patent. Tilton Tr. at 95:21-100:19.

Similarly, claim 15 of the '764 Patent, despite calling for an intermediate member, still claims an arrangement with "the pump chamber and the thermal exchange being spaced apart from each other in a vertical direction and fluidly coupled together." '764 patent at claim 15. However, in the CoolIT designs, there is an additional chamber that is formed between the intermediate member and the pump impeller, described by Dr. Pokharna as the intermediate plenum chamber. Pokharna Non-Infringement Rebuttal at 9. The fluid coupling in the CoolIT accused devices is between the intermediate plenum chamber and the pump chamber, and between the intermediate plenum chamber and the heat exchange chamber, but not directly between the heat exchange chamber and the pump chamber, as required by claim 15 of the '764 patent. Accordingly, the accused CoolIT products do not infringe any of the asserted claims of the '764 patent.

## V. EVEN IF COOLIT'S PRODUCTS DID INFRINGE, COOLIT'S SALES OF ALLEGEDLY INFRINGING PRODUCTS TO CORSAIR (HONG KONG), A FOREIGN COMPANY, ON FOREIGN SOIL ARE NOT INFRINGING AS A MATTER OF LAW

Even if CoolIT's accused products did infringe the Asetek patents, CoolIT is not liable to Asetek for damages for its sales to Corsair in the normal course of business[3] because none of the allegedly infringing conduct in connection with the normal course of Corsair sales occurs within the United States. The products sold by CoolIT, a Canadian company, to Corsair (Hong Kong) Ltd. are sold to a Hong Kong entity, paid for by a Hong Kong entity, and delivered to a Hong Kong entity in Hong Kong. Accordingly, CoolIT does not take any action in connection with its sales to Corsair within the United States.

As a general rule, a U.S. patent does not have extraterritorial effect; activities must occur within the United States to give rise to a claim of infringement under 35 U.S.C. § 271. 35 U.S.C. § 271(a), which governs patent infringement, provides: "whoever without authority makes, uses,

---

[3] It is possible that a limited number of transactions between CoolIT and Corsair did not follow the normal course described herein. Even if that is true, however, it does not prevent entry of summary judgment. The potential factual issue of whether a limited number of transactions deviated from the norm does not prevent the Court from ruling on the purely legal issue of whether a U.S. patent has sufficient extraterritorial reach to affect a transaction between two foreign countries that occurs outside of the United States.

1   offers to sell, or sells any patented invention, within the United States or imports into the United

2   States any patented invention during the term of the patent therefore, infringes the patent."

3        The "Federal Circuit made it unequivocally clear that the patent laws do not prohibit

4   infringement abroad and therefore do not provide 'damages adequate to compensate' for such

5   infringement." *Fr. Telecom S.A. v. Marvell Semiconductor Inc.*, 2014 U.S. Dist. LEXIS 52564,

6   *50-51 (N.D. Cal. Apr. 14, 2014) (Orrick, J.) (citing *Power Integrations, Inc. v. Fairchild*

7   *Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013)).  As the Supreme Court has

8   stated, the "traditional understanding that our patent law operates only domestically and does not

9   extend to foreign activities is embedded in the Patent Act itself . . . . In short, foreign law alone,

10  not United States law, currently governs the manufacture and sale of components of patented

11  inventions in foreign countries." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455-56 (U.S.

12  2007) (citation and internal punctuation omitted).  In *Power Integrations*, the Federal Circuit

13  noted that the defendant had "not cited any case law that supports an award of damages for sales

14  consummated in foreign markets, **regardless of any connection to infringing activity in the**

15  **United States**."  711 F.3d at 1371 (emphasis added).  This is so because "the entirely

16  extraterritorial production, use, or sale of an invention patented in the United States is an

17  independent, intervening act that, under almost all circumstances, cuts off the chain of causation

18  initiated by an act of domestic infringement." *Id.* at 1371-72.  This holds true even for products

19  that ultimately end up in the United States.  *See Fr. Telecom S.A.*, 2014 U.S. Dist. LEXIS 52564,

20  at *56-8.

21       In this case, CoolIT's sales to Corsair involve activities conducted outside the U.S.  The

22  Product Purchase Agreement is between CoolIT, a foreign company based in Calgary, Canada,

23  and Corsair Hong Kong, a foreign company based in Hong Kong.  Decl. of Geoffrey S. Lyon in

24  Supp. of Def.'s Mot. to Dismiss ("Lyon Decl."), ¶3 & Ex. A, ECF No. 23, attached as Ex. I to the

25  Dion Decl.  Pursuant to the Agreement, Corsair Hong Kong issues purchase orders to CoolIT.  *Id.*

26  at ¶4 & Ex. B.  After receiving a purchase order, CoolIT delivers the H60, H80, and H100

27  products to Corsair Hong Kong on the terms of Free Alongside Ship ("FAS"), at which point title

28  transfers to Corsair Hong Kong.  *Id.* ¶5 & Ex. B; *see ImEx Trading Co. v. The Vessel, Beate*

1    *Oldendorff*, 841 F. Supp. 1151, 1152 (M.D. Fla. 1993) (under FAS terms, title passes upon

2    delivery to the dock).  Upon delivery, CoolIT issues an invoice to Corsair Hong Kong and Corsair

3    Hong Kong pays CoolIT for the delivered products.  Lyon Decl. at ¶5.  No part of the transaction

4    takes place in the United States.  This course of conduct was confirmed by Corsair's CEO, Andy

5    Paul.  Transcript of April 2, 2014 Deposition of Andy Paul ("Paul Tr."), attached as Ex. J to the

6    Dion. Decl., at 165:10-15; 241:1-247:3; 256:19-261:12; 294:7-296:8.  In fact, Mr. Paul confirmed

7    that this arrangement, which Corsair insists on with all of its vendors, was set up by Corsair in

8    conjunction with its corporate restructuring and for Corsair's own benefit.  *Id.* at 130:7-11.

9        In *MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicon Corp.*, 420 F.3d 1369 (Fed. Cir.

10   2005), the Federal Circuit considered very similar circumstances and determined that a sale

11   between two foreign entities, where title transferred in Japan, could not constitute infringement as

12   a matter of law, even though the seller knew that the foreign purchaser sent the accused products

13   to its American affiliate in Texas and even where the seller communicated directly with the

14   American affiliate regarding the sales.  *MEMC*, 420 F.3d at 1376-77.

15       Where, as here, a foreign company sells allegedly infringing products to another foreign

16   company, on foreign soil, those acts do not support a claim of infringement, even if the seller

17   knows that some of the product will ultimately be imported into the United States.  *Id.* at 1377

18   *citing Rotec Indus. Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000).  In fact,

19   regardless of any activity that may have occurred between CoolIT and Corsair in the U.S., the

20   ultimate production, use, and sale of the products outside of the U.S. "is an independent,

21   intervening act that…cuts off the chain of causation," *Power Integrations*, 711 F.3d at 1371-72,

22   and precludes liability.  Just as in *MEMC*, *Power Integrations*, and *Fr. Telecom*, the Court cannot

23   extend the extraterritorial reach of Asetek's patents to implicate CoolIT's entirely ex-U.S.

24   conduct, as Asetek invites the Court to do.  Accordingly, Asetek cannot claim damages for

25   CoolIT's sales to Asetek outside of the U.S. and summary judgment in CoolIT's favor is

26   appropriate.

27

28

1    **VI.    ASETEK IS NOT ENTITLED TO LOST PROFITS**

2            There is no genuine dispute that Asetek's claim for recovery of lost profits does not meet

3    the *Panduit* test at least because there were and are acceptable non-infringing alternatives to the

4    Asetek patents available.  As a result, Asetek, at most, would be entitled only to a reasonable

5    royalty if the Court or jury were to determine that CoolIT's products infringe Asetek's patents.

6            **A.    The *Panduit* Standard and Its Progeny**

7            "To recover lost profits damages, the patentee must show a reasonable probability that,

8    'but for' the infringement, [the patentee] would have made the sales that were made by the

9    infringer."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).  The

10   Court of Appeals for the Sixth Circuit in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*

11   articulated the following four factors that the patentee must establish to satisfy the lost profits

12   causation requirement (known as the "*Panduit* Test"): "(1) demand for the patented product, (2)

13   absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability

14   to exploit the demand, and (4) the amount of the profit he would have made." 575 F.2d 1152,

15   1156 (6th Cir. 1978). The *Panduit* Test "has [] been accepted as a useful, but non-exclusive, way

16   for a patentee to prove entitlement to lost profits damages." *Rite-Hite*, 56 F.3d at 1545.

17           Under the second factor of the *Panduit* Test, the patentee must show that there is an

18   "absence of acceptable noninfringing substitutes." *Panduit*, 575 F.2d at 1156.  Thus, "acceptable

19   substitutes that the infringer proves were available during the accounting period [*i.e.*, 'the period

20   of infringement for which the patent owner claims damages'] can preclude or limit lost profits."

21   *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999).

22           Addressing whether a noninfringing alternative product is "acceptable," the Court of

23   Appeals for the Federal Circuit in *Grain Processing* wrote, "[w]hether and to what extent [the

24   infringer's] alleged alternative prevents [the patentee] from showing lost sales of [its infringed

25   product] depends . . . on whether and to what extent it was acceptable as a substitute in the

26   relevant market." *Id.* at 1355.  The court continued:

27                   Consumer demand defines the relevant market and relative
                     substitutability among products therein. Important factors shaping
28                   demand may include consumers' intended use for the patentee's

ASETEK HOLDINGS, et al. v. COOLIT                    13          DEF'S MOTION FOR SUMMARY JUDGMENT
SYSTEMS, INC. – 3:12-CV-04498-EMC

product, similarity of physical and functional attributes of the patentee's product to alleged competing products, and price. Where the alleged substitute differs from the patentee's product in one or more of these respects, the patentee often must adduce economic data supporting its theory of the relevant market in order to show 'but for' causation.

*Id.* (internal citations omitted); *see also Linear Tech. Corp. v. Micrel, Inc.*, 2006 U.S. Dist. LEXIS 96860, at *116-17 (N.D.Ca. June 9, 2006) (finding defendant's proffered noninfringing alternative, produced three years after the infringement period commenced, to be acceptable based on its "functional similarity" to the infringing device "despite the small loss in efficiency of the re-designed parts," and that defendant's "customers either did not notice or did not care that their devices had been changed").

With respect to whether a proposed noninfringing alternative is "available," in addition to products that are "actually 'on sale' during the infringement period" (which are, of course, "available"), even a product that was "not on the market at the time of infringement can, in certain circumstances, constitute an available, noninfringing alternative." *Micro Chem. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) (citing *Grain Processing*, 185 F.3d at 1351-52).

In *Grain Processing*, the court concluded that the defendant's proffered noninfringing alternative was "available" throughout the accounting period, *id.* at 1354, by "weigh[ing] the factors that would show the substitute's effect on the market." *Micro Chem.*, 318 F.3d at 1123 (citing *Grain Processing*, 185 F.3d at 1346). Such factors included the availability of the requisite materials, equipment, knowledge, and experience, as well as considerations of time and cost. *See Grain Processing*, 185 F.3d at 1354. Specifically, the defendant in *Grain Processing* "could readily obtain all of the materials needed" and "had all of the necessary equipment, know-how, and experience" for the alleged substitute. *Id.* The court also considered cost as a factor, noting that "the high cost of a necessary material can conceivably render a substitute 'unavailable,'" though the necessary material in *Grain Processing* "was not prohibitively expensive to [the defendant]" based on the fact that its "'substantial profit margins' . . . were sufficient for it to absorb the 2.3% cost increase" using such material. *Id.*

**B.      Application of *Panduit* – No Lost Profits for Asetek**

It is impossible for Asetek to meet the *Panduit* lost profits causation requirements.  Most significantly, Asetek cannot establish an absence of acceptable non-infringing substitutes because other configurations of the cooling systems are possible.   Asetek's Chief Executive Officer admitted this fact.  *See* Transcript of April 8, 2014 Deposition of Andre Eriksen ("Eriksen Tr."), attached as Ex. K to the Dion Decl., at 77:14-88:4.  CoolIT has used alternative, non-infringing, designs in the past, designs that Asetek concedes do not infringe.  CoolIT could have reverted to its prior designs.  And, by adapting its newest cold plate design to use in its prior, non-infringing design, CoolIT could have achieved the same cooling efficiency as in its newer product.  Again, Asetek admits this fact and agrees that the cold plate is **the** critical element for the systems efficiency:

> Q.  Do you think, if you took the Generation [4][4] cold plate and developed that system that had that cold plate separated from pump, from a thermal performance standpoint, do you think they would perform similarly?
>
> *          *          *
>
> A.  I think the way to characterize it is if you make sure the liquid flow to the cold plate was the same, then the performance of the cold plate would also be the same.

Eriksen Tr. at 68:13-23.  This combination of the new cold plate and old pump design would have been acceptable to Corsair, so long as it had sufficient thermal efficiency.  Mr. Eriksen confirmed that the supposed benefit of the Asetek patents is not on Corsair radar when it is specifying products.  Rather, Corsair cares about the appearance of the product, the thermal performance, and the cost.  *Id.* at 123:25-124:25.

Finally, CoolIT would have undoubtedly had sufficient resources, know-how, and time to implement this alternative design.  First, the two key components – the system design and cold plate design – already existed.  Second, CoolIT would have more than enough time to implement this design, including the time from when the patents issued through January 2013, when

---

[4] At his deposition, Mr. Eriksen confused Asetek's Gen III and Gen IV products. Thus, references to Gen III should be to Asetek's Gen IV design.

1  CoolIT's sales to Corsair were covered by Asetek's license with Corsair. *See* D.E.# 194.

2  Because at least one acceptable non-infringing alternative was available, Asetek cannot recover

3  lost profits, even if CoolIT is liable for patent infringement.

4  **VII.    THE '764 PATENT IS INVALID**

5          Asetek's '764 Patent is invalid under 35 U.S.C. §§ 102 and 103 because claims 1-19 are

6  anticipated by or are obvious from U.S. Patent No. 7,544,049 to Koga, published on December 2,

7  2004, and issued on June 9, 2009 ("Koga").[5]  *See* Expert Report of Dr. Himanshu Pokharna

8  Regarding the Invalidity of Asetek's U.S. Patent Nos. 8,240,362 and 8,245,764 ("Pokharna

9  Invalidity Report"), pp. 65-85, attached as Ex. L to the Dion Decl.  Contrary to the arguments

10  made in Dr. Tilton's report, the Koga Patent discloses each and every claim in Asetek's '764

11  Patent.

12          Starting with claim 1, Dr. Tilton states that "at least the limitation 'a heat-exchanging

13  interface, the heat-exchanging interface forming a boundary wall of the thermal exchange

14  chamber, and configured to be placed in thermal contact with a surface of the heat-generating

15  component,' recited in claim 1, is not disclosed or suggested by Koga."  However, Dr. Tilton's

16  assertion is factually inaccurate because Koga's heat generating component 2 forms a boundary

17  wall of sucking channel 19 and transverse section 30, which together function as a thermal

18  exchange chamber.  Dr. Tilton makes the unfounded assumption that there can be only one

19  thermal exchange chamber in a cooling device, which is erroneous.  By any functional definition,

20  Koga's sucking channel 19 and transverse section 30 act as a thermal exchange chamber because

21  heat transfers by contact from the heat generating component 2 to the outside wall of the sucking

22  channel 19, which carries coolant 41; through this subsystem, Koga's sucking channel 19 and

23  transverse section 30 accept heat from the heat generating component 2.  In other words, Koga's

24  pump room 15A is not the sole and exclusive heat exchange chamber of the Koga patent.

25

26  _____

27  [5] CoolIT notes that the United States Patent and Trademark Office already has issued an Action
Closing Prosecution determining all claims of the '764 patent to be invalid in a pending
reexamination before the Patent Trial and Appeal Board.  Issuance of a Right of Appeal Notice by

28  the Patent Trial and Appeal Board is expected shortly.

1    By arguing solely against one limitation of claim 1, Dr. Tilton implicitly admits that Koga

2    discloses the remaining limitations of claim 1.

3    Dr. Tilton relies on the fact that claims 2-3 and 6-9 depend from claim 1 as the reason why

4    claims 2-3 and 6-9 are not anticipated or rendered obvious by Koga.  By relying solely on the

5    dependence from claim 1, Dr. Tilton implicitly admits that the remaining limitations of these

6    claims are anticipated or rendered obvious by Koga.

7    Dr. Tilton disputes Dr. Pokharna's explanation of the way in which Koga exactly

8    discloses claim 4 ("The cooling system of claim 3, wherein the first side of the heat-exchanging

9    interface includes features that are adapted to increase heat transfer from the heat-exchanging

10   interface to the cooling liquid in the thermal exchange.")  Dr. Pokharna explains in his expert

11   report that Koga's inner surface of the casing 15 includes features adapted to increase heat

12   transfer from the casing 15 to the coolant.  Dr. Tilton attempts to argue that Dr. Pokharna

13   incorrectly interpreted "sucking channel 19" and "transverse section 30" as the "thermal

14   exchange chamber" of the '764 Patent, *see*, *e.g.*, Expert Report of Dr. Donald E. Tilton Regarding

15   Validity of U.S. Patent Nos. 8,240,362 and 8,245,764 ("Tilton Validity Report"), at 25, attached

16   as Ex. M to the Dion Decl., but these arguments are an attempt to distract from the actual

17   functionality and meaning of the specification of Koga by means of the differing terminology

18   used in Koga and the '764 Patent.  The sucking channel 19 and transverse section 30 of Koga

19   function as a thermal exchange chamber in that heat is transferred by direct contact from the heat

20   generating component 2 to the sucking channel 19 and transverse section 30.  Pokharna Tr. at

21   366:5-8.  The pump room 15A is not the sole and exclusive heat exchange chamber of the Koga

22   patent – the sucking channel 19 and transverse section 30 are also a heat exchange chamber.

23   Dr. Tilton relies on the fact that claim 5 depends from claim 4 as the reason why claim 5

24   is not anticipated or rendered obvious by Koga.  By relying solely on dependence from claim 4,

25   Dr. Tilton implicitly admits that the limitations of claim 5, ". . . at least one of pins or fins," are

26   anticipated or rendered obvious by Koga.  In other words, Dr. Tilton admits that the dimples 21

27   and/or protrusions 24 of the Koga patent disclose the pins or fins of claim 5 of the '764 Patent.

28

1    As for claim 10, Dr. Tilton states that the following limitations of the '764 Patent are not

2    disclosed or suggested by Koga: (1) "a thermal exchange chamber adapted to be positioned in

3    thermal contact with the heat-generating component"; and (2) "a separate pump chamber

4    vertically spaced part from the thermal exchange chamber and coupled with the thermal exchange

5    chamber through one or more passages configured for fluid communication between the pump

6    chamber and the thermal exchange chamber."  Dr. Tilton incorrectly states that "Koga fails to

7    disclose a 'pump chamber' separate from the 'thermal exchange chamber'" – Koga's sucking

8    channel 19 and transverse section 30 perform the function of a thermal exchange chamber despite

9    the difference in terminology because heat is transferred through direct contact between the heat

10   generating component 2 and the sucking channel 19 and transverse section 30.  Further, Dr.

11   Tilton is wrong to assert that Koga's sucking channel 19 and transverse section 30, which

12   together constitute a "thermal exchange chamber," are not placed in thermal contact with the

13   electronic component to be cooled – Koga's sucking channel 19 and transverse section 30 *are* in

14   thermal contact with the heat generating component 2.  Again, Dr. Tilton implicitly admits that

15   Koga discloses the remaining limitations of claim 10.

16   Dr. Tilton relies on the fact that claims 11-14 depend from claim 10 as the reason why

17   claims 11-14 are not anticipated or rendered obvious by Koga.  By relying solely on dependence

18   from claim 10, Dr. Tilton implicitly admits that the remaining limitations of claims 11-14 are

19   anticipated or rendered obvious by Koga.

20   As for claim 15, Dr. Tilton states that the following limitation of the '764 Patent is not

21   disclosed or suggested by Koga: "a reservoir including an impeller cover, an intermediate

22   member and a heat exchange interface, wherein a top wall of the reservoir and the impeller cover

23   define a pump chamber for housing the impeller, and the intermediate member and the heat

24   exchange interface define a thermal exchange chamber, the pump chamber and the thermal

25   exchange chamber being spaced apart from each other in a vertical direction and fluidly coupled

26   together."  Tilton Validity Report at 32.  Dr. Tilton based this faulty assertion on the idea that

27   Koga allegedly does not disclose a "pump chamber" that is separate from the "thermal exchange

28   chamber."  However, as discussed above in reference to claim 10, Koga's sucking channel and

1  transverse section function as a separate "thermal exchange chamber," meaning that Koga
2  anticipates or renders obvious claim 15.

3      Dr. Tilton relies on the fact that claims 16-18 depend from claim 10 as the reason why
4  claims 16-18 are not anticipated or rendered obvious by Koga.  By relying solely on dependence
5  from claim 10, Dr. Tilton implicitly admits that the remaining limitations of claims 16-18 are
6  anticipated or rendered obvious by Koga.

7  **VIII.   ASETEK'S GEN III AND GEN IV PRODUCTS INFRINGE THE COOLIT PATENT**

8      As detailed in the Pokharna Infringement Report, both Asetek's Gen III and Gen IV
9  products infringe claims 17-19 of the CoolIT patent.  Dr. Pokharna identifies how each accused
10 product includes each limitation of each of the asserted claims.  *See generally id.* at 7-90.  In
11 arguing against infringement, Asetek's expert only disputes one limitation ("a mid-portion
12 positioned between and mechanically coupled with the cap and the base member") of these
13 claims with regard to the Gen III products and two limitations ("a cap defining a recess at least
14 partially defining the reservoir" and "a port" in the housing wall) with regard to the Gen IV
15 products.  Expert Report of Dr. Donald E. Tilton Regarding Non-Infringement of U.S. Patent No.
16 8,382,456 ("Tilton Non-Infringement Report"), attached as Ex. N to Dion Decl.  Thus, it is
17 undisputed that the accused products meet all but these three limitations.  At his deposition,
18 however, Dr. Tilton implicitly or explicitly conceded that these elements are met also.

19      **A.    Asetek's Gen III Products Have "a Mid-Portion Positioned Between and
           Mechanically Coupled with the Cap and the Base Member"**
20

21     Asetek's Gen III products include a mid-portion, a cap, and a base member.  As identified
22 by Dr. Pokharna in the following picture, these are the upper cover to the cooling head, the
23 intermediate cover that encloses the impeller chamber and reservoir, and the base of the cooling
24 head, which includes the cold plate:

25
26
27
28



Pokharna Infringement Report at 61.

Dr. Tilton agrees.  *See* Tilton Non-Infringement Report at p. 19, ¶64.  Dr. Tilton's only argument against infringement is that "The impeller cover is not connected at all to the thermal exchange interface (the alleged 'base member')."  *Id.*  As can be readily seen from the picture, the "mid-portion" is press fit into the "cap," and then the "base" is screwed to the "cap".  When the "base" is screwed to the "cap," it necessarily creates a mechanical coupling between the "base" and the "mid-portion".  Dr. Tilton agrees that the "base" is "in mechanical contact" with the "mid-portion," Tilton Tr. at 159:13-161:16.[6]  Nonetheless, Dr. Tilton disputes that the "mid-portion" and the "base" are "mechanically coupled".  *Id.* at 164:5-21.  Dr. Tilton's position, in view of his admission that the two parts are in mechanical contact is not tenable.  Accordingly, Asetek's Gen III products infringe claims 17-19 of the CoolIT patent.

**B.**    **Asetek's Gen IV Products Have "a Cap Defining a Recess at Least Partially Defining the Reservoir"**

In his report, Dr. Tilton argues that the Asetek Gen IV products lack the requisite "recess" simply because the cap has no recess at all.  Tilton Non-Infringement Report at p. 30, ¶108 ("As described earlier with regard to claim 16, the alleged 'cap' has a flat inner wall *with no recess*

---

[6] The discussion here relates to claim 12, but Dr. Tilton notes in his report that his position with regard to this issue is the same for both claim 12 and claim 17.  *See* Tilton Non-Infringement Report at p. 19, ¶64.

1  *thereon.*") (emphasis added).  Yet again, when pressed on this issue at his deposition, Dr. Tilton was

2  forced to concede that the cap does, indeed, have a recess.  Tilton Tr. at 180:10-190:3.  Ultimately,

3  Dr. Tilton testified:

> Q. So, would you agree that there is a recess in the cap where – and
>    that the entire flat surface what we discussed sits in the recess?
>
> A. That, I guess, is true.  The recess – that entire flat surface is very
>    slightly below the lip that holds the O-ring in place.

7  *Id.* at 189:8-13.

8  ### C.   Asetek's Gen IV Products Have a "Port"

9  Claim 17 of the CoolIT patent requires, *inter alia*, an impeller chamber and a reservoir,

10  which are separated "by a housing wall defining a port configured to fluidicly couple the impeller

11  chamber and the reservoir…"  CoolIT Patent at claim 17.  The Asetek Gen IV products, while

12  lacking a port formed directly in the wall, have a "port" that is formed by a recess in the cap that

13  allows fluid to flow over the top of the wall, as seen here:



22  Pokharna Infringement Report at 83.  This port is defined, at least in part, by the housing wall.

23  Even if the port is not literally present this limitation is satisfied under the doctrine of equivalents.

24  "To find infringement under the doctrine of equivalents, any differences between the

25  claimed invention and the accused product must be insubstantial.  One way of proving

26  infringement under the doctrine of equivalents is to show, for each claim limitation, that the

27  accused product performs substantially the same function in substantially the same way with

28  substantially the same result as each claim limitation of the patented product."  *Brilliant*

1   *Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1346-1347 (Fed. Cir. 2013) (quotations and

2   citations omitted).  Here, claim 17 explicitly states that the function of the port is to "fluidically

3   couple" the impeller chamber and the reservoir, a function that is undoubtedly performed by the

4   recess in the cap of the Gen IV product.  *See* Tilton Tr. at 175:20-176:15.  Moreover, the way in

5   which this fluidic coupling is accomplished (an opening between the two areas) and also the

6   result (fluid coupling of the impeller chamber and reservoir) are substantially the same.   In

7   disputing infringement of this element of claim 17, Dr. Tilton relied on flow path limitations from

8   claim 1 that are simply not present in claim 17.  *Id.* at 177:21-180:9.  Because the limitations

9   relating to the flow path in claim 1 are not present in claim 17, this argument is irrelevant.

10  Accordingly, there are no disputes of material fact that Asetek infringes claims 17-19 of the

11  CoolIT patent.

12  **IX.    ASETEK CANNOT SHOW WILLFUL INFRINGEMENT OF THE ASETEK PATENTS**

13         Because Asetek cannot establish infringement of the Asetek patents, its claim for willful

14  infringement necessarily fails.  But even if a genuine issue of material fact existed on the issue of

15  infringement of the Asetek patents (which it does not), the Court should dispose of Asetek's

16  baseless willful infringement claim on summary judgment because, at every relevant time period,

17  CoolIT had clear, legitimate, and objectively reasonable defenses to Asetek's claims.

18         The Federal Circuit has held that a showing of willful infringement requires that the

19  plaintiff establish by clear and convincing evidence (1) that the accused infringer "acted despite

20  an objectively high likelihood that its actions constituted infringement of a valid patent," and (2)

21  that this objectively defined risk "was either known or so obvious that it should have been known

22  to the accused infringer."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en*

23  *banc*).

24         The evidence affirmatively establishes that Asetek cannot establish willful infringement.

25  Under the objective prong of the willful infringement analysis, "a patentee must show by clear

26  and convincing evidence that the infringer acted despite an objectively high likelihood that its

27  actions constituted infringement of a valid patent."  *In re Seagate Tech., LLC*, 497 F.3d at 1371.

28  "The state of mind of the accused infringer is not relevant to this objective inquiry."  *Id.*  This

1    objective determination entails an assessment of the reasonableness of the accused infringer's

2    defenses, such as its arguments about non-infringement.  *See Bard Peripheral Vascular, Inc. v.*

3    *W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012).

4         The Federal Circuit recently made clear that this objective prong <u>presents a legal question</u>

5    <u>suitable for summary judgment</u>.  "When a defense or noninfringement theory asserted by an

6    infringer is purely legal (*e.g.*, claim construction), the objective recklessness of such a theory is a

7    purely legal question to be determined by the judge."  *Id*. at 1007.  Even in those instances when

8    the objective prong turns on factual issues, "the judge remains the final arbiter of whether the

9    defense was reasonable, even when the underlying fact question is sent to a jury."  *Id*.

10        Asetek's willful infringement claim fails as a matter of law under the objective prong

11   because CoolIT has reasonable non-infringement and invalidity defenses.  As explained above,

12   CoolIT has, and has had since the patent issued, clear non-infringement arguments.  In addition,

13   CoolIT has a reasonable argument regarding the invalidity of the Asetek patents.  In fact, all

14   claims of the '764 patent have been rejected by the USPTO in an action closing prosecution in a

15   pending reexamination.

16        Because CoolIT's non-infringement and invalidity defenses are and always have been

17   objectively reasonable—in fact, more than sufficient to warrant summary judgment—Asetek's

18   entire willful infringement claim fails.  *See Bard Peripheral Vascular, Inc*., 682 F.3d at 1006

19   (satisfying objective prong is a "threshold determination" for a finding of willfulness).

20   **X.    CONCLUSION**

21        CoolIT's accused products do not infringe the '362 and '764 patents.  Even if they did,

22   CoolIT is not liable to Asetek for its sales to Corsair, since those sales occur outside the U.S.  In

23   addition, Asetek's claim for lost profits does not meet the standard articulated in *Panduit*, so

24   Asetek, at most, would be entitled only to a reasonable royalty if this Court were to hold that

25   CoolIT's products infringe Asetek's patents at issue.   Notwithstanding CoolIT's non-

26   infringement, Asetek's '764 Patent is invalid under 35 U.S.C. §§ 102 and 103 because claims 1-

27   19 are anticipated by or are obvious from U.S. Patent No. 7,544,049 to Koga.  Finally, it is

28   undisputed that Asetek infringes claims 17-19 of the CoolIT patent.

1    Accordingly, and for the reasons stated herein, CoolIT respectfully requests that the Court

2    enter summary judgment in CoolIT's favor of (1) non-infringement of Asetek's U.S. Pat. Nos.

3    8,240,362 and 8,245,764 for all accused products; (2) no damages for all sales made by CoolIT

4    outside of the U.S.; (3) no lost profits damages; (4) invalidity of U.S. Pat. No. 8,245,764; and (5)

5    infringement by Asetek's Gen III and Gen IV products of CoolIT's U.S. Pat. No. 8,382,456.

6    Dated: June 19, 2014                    BLANK ROME LLP
                                             DENNIS P. MCCOOE
7                                            JOEL L. DION

8

9                                            /s/ *Joel L. Dion*
                                             _____
10                                           JOEL L. DION
                                             Attorneys for Defendant
11                                           COOLIT SYSTEMS INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2        The undersigned certifies that, on June 19, 2014 I caused a copy of the foregoing

3   DEFENDANT COOLIT SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION FOR

4   SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PAT. NOS. 8,240,362 AND

5   8,245,764, NO DAMAGES FOR NON-U.S. SALES, NO LOST PROFITS, INVALIDITY OF

6   U.S. PAT. NO. 8,245,764, AND INFRINGEMENT OF U.S. PAT. NO. 8,382,456 to be filed with

7   the Court via ECF and served electronically thereby on the following counsel of record:

8

9                        ROBERT F. McCAULEY
                         robert.mccauley@finnegan.com

10                       Jeffrey D. Smyth
                         jeffrey.smyth@finnegan.com

11                       Holly Atkinson
                         holly.atkinson@finnegan.com

12                       FINNEGAN, HENDERSON, FARABOW,
                              GARRETT & DUNNER LLP

13                       3300 Hillview Avenue
                         Palo Alto, CA  94304

14                       Telephone:    (650) 849-6600
                         Facsimile:    (650) 849-6666

15

16

17                              /s/ Joel L. Dion
                                Joel L. Dion

18

19

20

21

22

23

24

25

26

27

28